Jacques SARLIE, Plaintiff,

v.

E. L. BRUCE CO. (Incorporated), and
Edward M. Gilbert, Defendants.

No. 63 Civ. 1599.

United States District Court
S. D. New York.

March 1, 1967.

Poletti, Freidin, Prashker, Feldman & Gartner, by Robert M. Haft, New York City, for Jacques Sarlie.

Arnold Bauman, New York City, for defendant Gilbert.

Webster, Sheffield, Fleischmann, Hitchcock & Chrystie, by Thomas Field and John I. Boswell, New York City, for E. L. Bruce Co.

CANNELLA, District Judge.

Damages awarded after inquest as follows: Bruce is awarded damages with respect to the First Counterclaim in the amount of $327,476.97, together with 6% interest per annum from July 11, 1962, and, with respect to the Amended Second and Third Counterclaims, the sum of $500,000, together with interest at 6% from June 7, 1962.

On May 31, 1963, Jacques Sarlie instituted suit against the E. L. Bruce Company [hereinafter referred to as "Bruce"] and Edward M. Gilbert, the former president of Bruce,[1] charging violations of the federal securities laws and seeking thereby to recover $2,000,-000, with interest, in damages.

Sarlie's complaint alleged five causes of action. Firstly, it charged Bruce and Gilbert, jointly and severally, with violations of Section 10(b) [2] of the Securi-

---

1. At all times relevant to this opinion Gilbert was the president of Bruce.

2. 15 U.S.C. § 78j(b).

ties Exchange Act of 1934 [hereinafter referred to as the "Exchange Act"] and Rule 10(b) (5) [3] of the Securities and Exchange Commission, in that the defendants made certain false statements and omitted to state other material facts in connection with the sale of Bruce stock by Gilbert to Sarlie to the latter's damage.

The second cause of action, brought solely against Gilbert, alleged violations of Sections 12(2) [4] and 17(a) [5] of the Securities Act by reason of Gilbert's false statements and omissions of material facts as well as his failure to file an effective registration statement for the Bruce stock which had been sold.

Thirdly, Sarlie alleged a conspiracy between Bruce, Gilbert and others by whom false statements were made and material facts omitted in connection with the sale of Bruce stock by Gilbert to Sarlie.

The fourth cause of action, based upon the deceptive practices alleged in the other causes of action, alleged a common law fraud against Bruce and Gilbert.

The fifth cause of action was brought against Bruce and sought indemnification for Sarlie in an action by McDonnell and Company, a registered stock broker-dealer, against Sarlie for monies alleged to be due to McDonnell by reason of Sarlie's purchases of Bruce stock from McDonnell.

Gilbert, in an answer filed on July 9, 1963, entered a general denial to Sarlie's complaint.

Bruce, in turn, filed an answer on July 19, 1963, generally denying the allegations of the complaint and raising as an affirmative defense the fact that Sarlie had engaged in a series of transactions for the purpose of pegging, fixing or stabilizing the price of Bruce stock in contravention of Sections 9(a) [6] and 10(b) [7] of the Exchange Act, along with the Rules of the S.E.C. promulgated thereunder, and Sections 5 [8] and 17(a) [9] of the Securities Act of 1933.

In addition, Bruce alleged three counterclaims.

The first charged Sarlie with the unlawful manipulation in the stock of the Celotex Company [hereinafter referred to as "Celotex"], in violation of Sections 9(a) and 10(b) of the Exchange Act.

The second counterclaim alleged that Gilbert, acting for himself and not in his capacity as Bruce's president, entered into unlawful transactions and agreements with Sarlie by which Gilbert, without authority, misappropriated Bruce funds and passed a substantial portion thereof to Sarlie. The third counterclaim alleged that Sarlie knew, or should have known, that the sums withdrawn by Gilbert from Bruce were monies to which Gilbert was not entitled.

Each counterclaim was held legally sufficient by Judge Murphy on May 10, 1966.[10]

In July of 1963 the deposition of Sarlie was noticed to be taken. It is clear that the deposition of Sarlie is essential for the proper presentation of Bruce's case. The commencement of the examination was adjourned several times and did not actually commence until December 6, 1963. After that date it was adjourned repeatedly, generally at the request of Sarlie, and, ultimately, was not completed.

On the fifteenth day of December, 1965, the examination of Sarlie by Bruce had been noticed to be continued. Upon service of this notice Sarlie moved pur-

---

3. 17 C.F.R. 240.10b–5.

4. 15 U.S.C. § 77*l*(2).

5. 15 U.S.C. § 77q(a).

6. 15 U.S.C. § 78i(e).

7. 15 U.S.C. § 78j(b).

8. 15 U.S.C. § 77e.

9. 15 U.S.C. § 77q(a).

10. Judge Murphy's memorandum provided, in pertinent part, that "plaintiff Sarlie's motion for an order dismissing the counterclaims on the ground that they fail to state claims upon which relief can be granted is denied and paragraphs 9D and 9E of the counterclaims are amended so that the word 'plaintiff' is deemed to read 'Bruce'."

suant to Fed.R.Civ.P. 30(b) [11] for a protective order directing that the remainder of his examination be taken by written interrogatories or, if taken orally, that this be done at Paris, France, his then alleged place of residence. As a third alternative it was suggested that the examination be postponed until shortly before the trial.

In response to Sarlie's motion, Bruce moved, by motion filed January 31, 1966, pursuant to Fed.R.Civ.P. 37(d) [12] to dismiss the complaint because of Sarlie's alleged wilful failure to complete his deposition. Alternatively, it was suggested that Sarlie be ordered to appear at the Southern District Courthouse for the continuation and completion of his examination.

By a written memorandum filed March 16, 1966, Judge McGohey disposed of both motions.

Regarding Sarlie's motion, it was, in all respects, denied.

With respect to Bruce's motion to dismiss the complaint, it was denied but without prejudice to renewal if, in the opinion of Bruce's counsel, Sarlie's future conduct made such a course advisable. Further, Sarlie was directed to "appear within twenty days from the date [of the memorandum] or on such other date as counsel may agree upon, for the continuation of his deposition at the Southern District Courthouse, and the deposition [was] to continue there from day to day until completed."

The twenty day period provided for in the aforesaid order expired on April 5, 1966. At that time Sarlie had failed to appear for the continuation of the examination. It was clear that the failure of Sarlie to appear within the designated time was the result of a clear and studied determination by Sarlie after all efforts to continue to postpone the deposition of Sarlie had failed.

Thereafter, on April 12, 1966, Bruce filed a renewed motion for an order pursuant to Fed.R.Civ.P. 37(d) based on Sarlie's wilful failure to comply with the March 16, 1966 order of Judge McGohey. By his motion, Bruce again sought a dismissal of Sarlie's action against Bruce, the entry of a default judgment against Sarlie and in favor of Bruce on the latter's counterclaims and an award of cost and disbursements together with interest from June 12, 1962.

By memorandum filed May 10, 1966, Judge Murphy granted Bruce's renewed motion in all respects.[13] Thereafter, on May 26, 1966, Judge Murphy entered an order directing that, inter alia, the amount of Bruce's damages were to be determined by the court upon a hearing and that a judgment was to be entered in favor of Bruce in the amount as determined at the aforesaid hearing.

Pursuant to Judge Murphy's order, on October 10, 11, and 13, 1966, a hearing in the nature of an inquest for damages was held by this court. During this hearing both Bruce and Sarlie appeared through counsel, questioned witnesses, made oral argument and submitted trial memoranda. At the conclusion of the hearing each side was directed to submit proposed findings of fact and conclusions of law to the court.[14]

11. In pertinent part, Rule 30(b) provides that "the court in which the action is pending may make an order that the deposition shall not be taken, or that it may be taken only at some designated place other than that stated in the notice, or that it may be taken only on written interrogatories * * *."

12. Rule 37(d) provides, in part, that "[i]f a party * * * wilfully fails to appear before the officer who is to take his deposition, after being served with a proper notice, * * * the court on motion and notice may strike out all or any part of any pleading of that party, or dismiss the action or proceeding or any part thereof, or enter a judgment by default against that party."

13. This May 10, 1966 order of Judge Murphy, provided that, inter alia, "defendant Bruce's motion pursuant to Rule 37(a) for dismissal of the complaint and default judgment on its counterclaim is granted."

14. Only counsel for Bruce, however, submitted the ordered memoranda.

Before passing upon the respective arguments of opposing counsel, in the interest of clarity the factual background upon which the counterclaims rest, follows.

*The First Counterclaim*

With an eye toward ultimately gaining control of the Celotex Corporation, in the period extending from March 6, 1962 until June 4, 1962, Bruce purchased through the New York Stock Exchange a total of 60,900 [15] shares of Celotex securities.

The purchase price of 60,800 shares ranged from a high of 41 and ½ on March 6, 1962, to a low on June 4, 1962, of 24 and ½. [See Exhibit C]. Of these 60,800 shares, all but 1300 shares were purchased at prices exceeding $30 per share. [See Exhibit C]. The aggregate purchase price for this block of stock was $2,172,050.97. Additionally, on April 19, 1962, Bruce purchased 100 shares from one Seymour Kalb for $3,132. [See Exhibit MM].

On July 11, 1962, Bruce sold the entire block of 60,900 shares of Celotex for $1,827,000, based on a sales price of $30 per share. [See Exhibit D].

Concededly, by his default, Sarlie has admitted that he participated in a manipulation of the stock market with respect to Celotex shares, that his acts violated Sections 9(a) and 10(b) of the Exchange Act, that Bruce purchased Celotex shares in the period from March 6, 1962 through June 4, 1962, and that the prices at which Bruce purchased the Celotex shares were affected by the plaintiff's manipulations thereof.

Notwithstanding this, argues Sarlie, by means of its pleaded formula Bruce must nevertheless prove the exact amount of damages incurred by Bruce as a result of the manipulation. That is, Bruce must prove the difference between the prices at which it purchased the stock and the prices at which it would have purchased the stock in an unmanipulated market, for this, reasons Sarlie, is the theory advanced by Bruce in his counterclaim and, pursuant to Fed.R. Civ.P. 54(c),[16] must be the theory which the court applies in awarding damages upon this default.

In support of its position Sarlie also cites several cases for the proposition that the theory for the computation of damages cannot be changed after a default.[17]

For its part, counsel for Bruce concedes that the formula suggested in its counterclaim normally would be the appropriate measure for the computation of damages. But its application in this proceeding, argues Bruce, would be impossible for Sarlie, by reason of his default in pretrial discovery, has effectively prevented Bruce from ascertaining the true extent of the manipulation which the Celotex securities underwent. Under such circumstances, argues Bruce, there could not be the required element of certainty in any award of damages. Therefore, concludes Bruce, the court should relax the application of Rule 54

---

15. The total amount of Celotex purchases by Bruce during the relevant period was actually 69,200 shares. Of that total, however, 8,300 shares were actually delivered to Bruce. Damages to the extent of this block of 8,200 shares were sought in an independent action brought by Bruce against Sarlie in the New York State Supreme Court and, therefore, were not sought in the instant action. See N.Y.L.J., page 18, Column 4, January 23, 1967. Accordingly, the damages sought in this action are limited to the loss suffered on the remaining 60,900 shares, and any mention of purchases during the period in question is qualified to exclude that amount.

16. Rule 54(c) provides, in pertinent part that "[a] judgment by default shall not be different from or exceed in amount that prayed for in the demand for judgment."

17. National Discount Corp. v. O'Mell, 194 F.2d 452, 454–456 (6 Cir. 1952); Prudential Ins. Co. of America v. Rader, 98 F. Supp. 44, 50 (D.Minn.1951); Pueblo Trading Co. v. El Camino Irrigation Dist., 169 F.2d 312, 313 (9 Cir. 1948), cert. denied, 335 U.S. 911, 69 S.Ct. 482, 93 L.Ed. 444 (1949).

(c) and in its place apply an alternative measure.

The practical problem with which this court is faced is intensified by the absence in Sections 9 and 10(b) of a provision for a measure of damages to be applied in cases involving the violation of those sections.

█ Notwithstanding this, formulae do exist and have been applied in this field. Concededly, the customary measure is the one pleaded by Bruce in its counterclaim. Alternative measures are available, however, and include (1) the common law tort measure, i. e., the difference between the purchase price and the resale price where the security is sold prior to the discovery of the tort; and (2) the measure provided for in Section 11 of the Exchange Act, i. e., the difference between the purchase price and the resale price where the security involved is sold prior to commencement of suit.[18] See 3 Loss, Securities Regulation 1749 (2 Ed. 1961).

█ In this court's opinion, the formula to be applied with respect to this counterclaim is the common law tort measure of damages.

This court is unimpressed by the arguments advanced by Sarlie's able counsel, when they are considered in light of the fact that it was Sarlie's own conduct which prevented the application of the pleaded theory of damages. To permit Sarlie to prevail on the theory it has advanced would be to give to him a windfall to which in business morals and good conscience, he is not entitled.

This result is also appropriate in our circumstances for, as Bruce has agreed to base its damages on the excess over $30 per share which it paid for the Celo-

tex shares, no prejudice is incurred by Sarlie for the market price of the securities in an unmanipulated market for the relevant period, as far as it can be determined by this court, would have been below $30 per share.[19] Indeed, it is the application of a principle more favorable to Sarlie's interest than that suggested in his own papers.

█ One further item requires disposition with respect to this counterclaim. As Bruce has agreed to base its damages on the excess over $30 per share which it paid for the Celotex shares, and as commissions were paid on the total purchase price of the shares, that portion of the commissions attributable to $30 per share, an amount of $20,706,[20] is to be deducted from the purchase price.

Accordingly, damages are to be awarded to Bruce on the First Counterclaim in the sum of $327,476.97, together with interest at 6% per annum from July 11, 1962. This sum represents the differential between the purchase price and the sales price, less the aforesaid commissions.

### The Second and Third Counterclaims

By his second and third counterclaims Bruce initially sought to recover $400,000 of its funds which Gilbert has passed to Sarlie. To briefly recapitulate, the Second Counterclaim is based on the theory that Sarlie was not a bona fide recipient of the misappropriated funds because he received the funds in payment of a debt from Gilbert arising out of illegal transactions between Sarlie and Gilbert. The Third Counterclaim, alternatively, simply repeats the allegations of the Second Counterclaim, but adds the allegation that Sarlie actually knew, or should have known, that Gilbert

---

18. Actually, a choice between the two theories is unnecessary in our case for the Celotex shares were sold both before discovery of the tort and before the commencement of this action and, hence, the application of either theory would lead to the same result. That is, under either theory Sarlie would be liable to Bruce for the difference between the purchase price and the sales price of $30 per share.

19. See Memorandum in Support of Proposed Finding Number Nine submitted by Bruce.

20. See the Constitution of the New York Stock Exchange, Article XV, § 2(a) (1) (i).

was transferring to him misappropriated funds.

At the hearing Bruce moved to increase from $400,000 to $500,000 the damages sought on the Second and Third Counterclaims. Sarlie opposed this effort on the part of Bruce and, citing Fed.R.Civ.P. 54(c),[21] argued that upon a default, the non-defaulting party is limited in his judgment to the amount pleaded. Therefore, the threshold question to be considered is whether or not an amendment of the ad damnum clause may be properly made after a default at this posture of the proceedings, i. e., after the complaint and answer have been filed and pretrial discovery begun.

■ Judgments by default are of two general kinds: (1) for want of appearance, and (2) for failure to plead or to otherwise defend as provided by the rules, although the party has initially appeared in the action. With respect to the amount and the character of a judgment to be entered in the event of a default, Fed.R.Civ.P. 55(d)[22] provides that in all cases a judgment by default is subject to Fed.R.Civ.P. 54(c). As previously noted, this latter rule provides, in part, that a default may not be different in kind nor exceed in amount that prayed for in the demand for judgment.

■■ It is arguable, however, that as a matter of policy the limitations of the Rule should apply only to a judgment by default for want of appearance and not to a default judgment where the defendant has appeared.[23] This position,

moreover, is in accord with the spirit of our unified procedure, for the demand for judgment is no part of the cause of action.

Nor is this approach without support in case law. In Peitzman v. City of Illmo, it was held that this limitation does not prevent an amendment of a plaintiff's prayer for relief by increasing the amount sought in the ad damnum clause. In that case it was said that "amendments to a pleading may be allowed at the hearing on damages as to the relief prayed, subject to the right of the defendant, if taken by surprise or put to a disadvantage, to ask for a continuance or for time in which to prepare to meet the enlarged claim."[24]

Moreover, as recently as 1963 this position was accepted by this District. In Trans World Airlines, Inc. v. Hughes,[25] the court, entering a default judgment based on the wilful and deliberate refusal to proceed with depositions and to obey discovery orders, permitted the plaintiff to increase its ad damnum clause from $105,000,000 liquidated damages to $135,000,000. The court therein noted the essential distinction between the two types of defaults and the reason for the different treatment when it said that it was "not a case where a party has defaulted in appearance. Here issue was joined and adversary proceedings continued in the pretrial stages of this litigation. The damages originally asserted were unliquidated and [Bruce] is entitled to recover for whatever damage it can show it suffered. Furthermore, [the defaulting party would] be represented

21. Fed.R.Civ.P. 54(c) provides, *inter alia*, that a "judgment by default shall not be different in kind from or exceed in amount that prayed for in the demand for judgment."

22. Rule 55(d) makes applicable the provisions of Rule 54(c) to the entry of a default judgment to all claimants, whether plaintiff, third party plaintiff or, as here, counterclaimant. See also, Commercial Cas. Ins. Co. v. White Line Transfer & Storage Co., 141 F.2d 946 (8 Cir. 1940).

23. See e. g., Clark and Moore, A New Federal Civil Procedure—II; Pleadings and Parties, 44 Yale L.J. 1291, 1303 (1935).

24. Peitzman v. City of Illmo, 141 F.2d 956, 962 (8 Cir.), cert. denied, 323 U.S. 718, 65 S.Ct. 47, 89 L.Ed. 577 (1944).

25. Trans World Airlines, Inc. v. Hughes, 32 F.R.D. 604 (S.D.N.Y.1963), aff'd in part, rev'd in part on other grounds 332 F.2d 602 (2 Cir. 1964), cert. dismissed as improvidently granted, 380 U.S. 249, 85 S.Ct. 934, 13 L.Ed.2d 818 (1965). Cf. Fong v. United States, 300 F.2d 400 (9 Cir. 1962).

at the hearings necessary to assess damages under rule 55(b) (2)." [26] This is our case.

Therefore, this court finds that Bruce can, at this posture of the proceedings, amend its Second and Third Counterclaims from $400,000 to $500,000.

■ Having put to one side the issue of whether the counterclaimant can properly amend his pleadings, the question now is one of whether the counterclaimant has sustained its burden òf proof with respect to the amount sought, for a default does not admit the amount of unliquidated damages sought.

By his default Sarlie had only admitted that between May 28, 1962 and June 7, 1962, he received funds wrongfully withdrawn from Bruce by Gilbert; that Sarlie knew or should have known that the funds were wrongfully withdrawn by Gilbert from Bruce; and that he received them in connection with illegal transactions with Gilbert.

Background is again requisite. Prior to the events hereinafter described, Sarlie and Gilbert entered into a series of agreements concerning the purchase and sale of Bruce shares and the division of the profits therefrom between themselves. Further, they entered into an agreement concerning shares of the Celotex Corporation whereby Sarlie was to finance the transactions to a large extent and Gilbert was to deposit with Sarlie, margin, in the event that the price of Celotex dipped below an agreed upon level.

On May 29, 1962, the stock market experienced a severe crisis with the result that the price of Celotex dipped below the agreed upon level and Gilbert, consequently, became indebted to Sarlie for several hundred thousand dollars in margin.

Pressured by this margin demand, besides other personal obligations, Gilbert, at the time the president of Bruce, withdrew without authorization the sum of approximately $1.9 million from Bruce's checking accounts. [27] It is alleged by Bruce, and this court so finds, that $500,000 of these funds were thereafter passed to Sarlie by Gilbert.

The mechanics for passing this sum of money to Sarlie were both clever and complicated.

Initially, Gilbert channeled $300,000 of the illegally withdrawn funds from Gilbert through Rhodes Enterprises, Inc. [hereinafter referred to as "Rhodes"], a corporation wholly owned by Gilbert. More specifically, on May 29, 1962 [Ex. HH], May 31, 1962 [Ex. II] and June 1, 1962 [Ex. JJ] Sarlie received three $100,000 checks from Gilbert drawn on the Rhodes account at the Manufacturers Hanover Trust Company [hereinafter referred to as "Manufacturers"]. These checks were admittedly cashed by Sarlie and the money therefrom deposited to Sarlie's accounts prior to Saturday, June 2, 1962. [28]

On June 2, 1962, Sarlie met with Gilbert, Irwin Polivy, the Secretary of Bruce, and Armand Boller at the Waldorf-Astoria Hotel in New York City, New York. During the meeting Sarlie admittedly [29] expressed his wish that he did not want to have the $300,000 which he had just received from Gilbert through Rhodes to appear to be a repayment of a prior obligation between Sarlie and Rhodes. [30] To rectify this, Rhodes was to make payments in the sum of $300,000 to Dutch American [31] for transmittal, via advices, through Ficomer, a Swiss bank with an account at Dutch American, to Sarlie's account in New York. Simultaneously, Sarlie was to give to Rhodes checks totalling the iden-

---

**26.** Supra, 32 F.R.D. at 607–608.

**27.** On September 25, 1964, Gilbert entered a plea of Guilty to Counts 1, 5 and 7 of the criminal indictment returned in this District on June 28, 1962 concerning these withdrawals.

**28.** Transcript of Hearing, pages 184–85.

**29.** Transcript of Hearing, page 187.

**30.** On April 10, 1962, Sarlie had lent $500,-000 to Rhodes. This obligation was outstanding on June 2, 1962. See Ex. 3.

**31.** Dutch American was an affiliate of Boller's situate in New York.

tical amount he had just received, $300,000, to be privately regarded as a return of the advances made to Sarlie during the previous week.

Accordingly, Sarlie gave his own checks, three in number, for $100,000 apiece to Polivy who kept possession of the checks until June 4, 1962.

For his part, Gilbert was to continue a scheme of unauthorized withdrawals of Bruce funds and the deposits thereof into Rhodes' account at Manufacturers. Between May 29, 1962 and June 7, 1962, inclusive, Gilbert caused to be deposited in the Rhodes account an aggregate total of $1,898,000. With the exception of $195,000 deposited on May 29, 1962 and $200,000 deposited on May 31, 1962, all of the funds were drawn on Bruce's checking account in the same branch of Manufacturers as the Rhodes account against funds actually on deposit. Parenthetically, no part of the funds from the Rhodes account was returned to Bruce.

On June 4, 1962, before the newly issued checks from Sarlie had cleared, Sarlie approached Gilbert and asserted that additional margin had become due. Consequently, on that day Gilbert executed a check for $200,000 [Ex. KK] with Dutch American as the payee for transmittal through Ficomer to Sarlie's account. This check was subsequently cashed by Sarlie and the proceeds thereof deposited into his accounts.

On the same day Rhodes deposited Sarlie's first check [Ex. Y] for $100,000 dated June 4, 1962.

Thereafter, as this $200,000 check was to be applied towards other obligations of Gilbert to Sarlie, an additional Rhodes check [Ex. LL] for $100,000 was delivered to Dutch American from Gilbert for Sarlie pursuant to the June 2nd agreement. Like the preceding three checks from Rhodes, this check was cashed and the proceeds therefrom deposited into Sarlie's accounts. Upon receipt of this latter check, Sarlie permitted his first check [Ex. Y], dated June 4, 1962, to clear.

The remaining two checks from Sarlie to Rhodes dated June 5, 1962 [Ex. Z–1], which Polivy admittedly altered to read "June 4" and "June 6", 1962 [Ex. EE], were deposited to the Rhodes account on June 5, and June 7, 1962, respectively. Neither of these two latter checks ever cleared although they were accepted by the bank subject to collection. Eventually, these checks were charged back.

In summary, Rhodes' checks to Sarlie, or to his accounts, totalled $600,000—the last check clearing on June 7, 1962. Of this total Rhodes received in return from Sarlie the sum of $100,000 represented by Sarlie's June 4th check. Consequently, Sarlie received illegally a net total of $500,000 in misappropriated Bruce funds.

Accordingly, damages are awarded to Bruce on the Amended Second and Third Counterclaims in the sum of $500,000, together with interest at 6% per annum from June 7, 1962.

The foregoing constitutes the findings of fact and conclusions of law of this court as required by Fed.R.Civ.P. 52(a).

It is so ordered.