Joseph STROBL, Plaintiff,

v.

NEW YORK MERCANTILE EX-CHANGE, Clayton Brokerage Co. of St. Louis, Inc., Heinold Commodities, Inc., Thomson and McKinnon, Auchincloss, Kohlmeyer, Inc., Ben Pressner, Pressner Trading Corp., John Richard Simplot a/k/a Jack Richard Simplot a/k/a J.R. Simplot, J.R. Simplot Company, Simplot Industries, Inc., Simplot Products Company, Inc., Peter J. Tagares a/k/a Peter J. Taggares, P.J. Taggares Company, C.L. Otter, SimTag Farms, Kenneth Ramm, A & B Farms, Inc., Hugh D. Glenn, Gearheart Farming, Inc., Ed McKay, Harvey Pollak, Henry Pollak, Henry Pollak, Inc., Henry A. Pollak & Company, Inc., Robert Reardon a/k/a Bobby Reardon, F.J. Reardon, Inc., Alex Sinclair, Sinclair & Company, Stephen Sondheimer, Charles Edelstein, James Landry a/k/a Jim Landry and Jerry Rafferty, jointly and severally, Defendants.

No. 79 Civ. 1834 (LFM).

United States District Court,
S.D. New York.

March 20, 1984.

Reargument Denied July 11, 1984.

Curtis, Mallet-Prevost, Colt & Mosle by Peter Fleming Jr., Scott J. McKay Wolas and Michael T. Zimmerman, New York City, for defendants John R. Simplot, J.R. Simplot Co., Simplot Industries, Inc., Peter J. Taggares, P.J. Taggares Co. and SimTag Farms.

Lovell & Westlow, and Leonard Toboroff, P.C., by Christopher Lovell, Edward J. Westlow, Victor E. Stewart and George F. Bramer, Jr., New York City, for plaintiff.

## OPINION

MacMAHON, District Judge.

The lengthy procedural history of this case may be traced through the following decisions which also provide excellent background and an understanding of commodity futures markets in general and Maine potato futures in particular: *National Super Spuds, Inc. v. New York Mercantile Exchange,* 470 F.Supp. 1256 (S.D.N.Y.1979) (denying implied right of action under Commodity Exchange Act, 7 U.S.C. §§ 1 et seq., and dismissing claims under the Act), *rev'd sub nom. Leist v. Simplot,* 638 F.2d 283 (2d Cir.1980) (reinstating claims under Commodity Exchange Act) (extensive dis-

cussion of commodity futures markets and operation), *aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982). *See also National Super Spuds, Inc. v. New York Mercantile Exchange,* 591 F.2d 174 (2d Cir.1979) (discovery motion in class action).

This case arose from:

the much publicized default in May 1976 of Maine potato futures contracts, when the sellers of almost 1000 contracts failed to deliver approximately 50,000,000 pounds of potatoes, resulting in the largest default in the history of commodities futures trading in this country. 470 F.Supp. at 1285 (footnote omitted).

*Leist v. Simplot, supra,* 638 F.2d at 285.

Defendants Simplot and Taggares, and the companies they control, are major potato processors with operations based in Idaho and Washington, respectively. Simplot processed over 2.5 billion pounds of potatoes in 1975–1976. According to his own testimony, his companies are "the biggest potato processors and the [sic] handlers, I guess, in America, or probably the world." Compared to Simplot, Taggares is a small processor; nevertheless, in 1975–1976, he processed over 650 million pounds of potatoes.

Plaintiff was a speculator in April and May 1976 Maine potato futures contracts. He purchased long contracts and liquidated them prior to the close of trading.[1]

In essence, plaintiff claimed that the price at which he liquidated his contracts was artificially low because of a successful conspiracy between defendants to manipulate downward the price of May 1976 Maine potato futures ("Maine futures").

**1.** Maine potato futures contracts are traded on the New York Mercantile Exchange. Although familiarity with futures trading is assumed, a brief explanation of terminology used in our opinion may prove helpful.

Transactions on the Exchange are typically expressed in terms of the sale (selling short) or purchase (buying long) of a contract, a standardized Exchange agreement under which the seller (the short) commits himself to deliver, or

the buyer (the long) to accept delivery of a specified quantity at a specified time and price fixed in bidding by open outcry on the Exchange floor. Delivery may be avoided by either the short buying long or by the long selling short on the futures exchange an equal number of offsetting contracts (liquidation). *See* T. Hieronymus, Economics of Futures Trading 38–44 (1971).

Plaintiff further contended that he lost money as a result of liquidating at an artificially low price and sought as damages the difference between what he actually received when he liquidated his position and what he would have received but for defendants' manipulation.

Following an eleven-day trial, the jury was charged on the following claims: (1) that defendants conspired to tamper with, fix or depress the price of Maine futures in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) that defendants manipulated or attempted to manipulate the price of Maine futures in violation of Section 9(b) of the Commodity Exchange Act, as amended, 7 U.S.C. § 13(b); (3) that defendants held short positions in excess of 150 car lots in Maine futures, without being bona fide hedgers, in violation of Section 4(a) of the Commodity Exchange Act, *supra*, 7 U.S.C. § 6(a), and the rules promulgated thereunder, 15 C.F.R. § 150.10; and (4) that defendants committed fraud on the Maine futures market in violation of New York common law.

The jury returned a verdict for plaintiff on all claims and awarded $460,000 in damages. This sum was trebled, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, and judgment was entered.

Defendants now move for judgment notwithstanding the verdict, or, in the alternative, for a new trial. We deny the motion in all respects. The following opinion treats individually the various grounds for defendants' motion.

## I.

### *Legal Sufficiency of the Evidence of Conspiracy*

A. *Conspiracy: Judgment Notwithstanding the Verdict*

Defendants move for judgment notwithstanding the verdict, Fed.R.Civ.P. 50(b), on the ground that there was insufficient evidence from which a jury could conclude that defendants conspired to manipulate the Maine potato futures market, in viola-

tion of Section 1 of the Sherman Act, 15 U.S.C. § 1.

Our scope of review on this motion is very narrow. We view the evidence in the light most favorable to plaintiff—the party who secured the verdict—and we give plaintiff "the benefit of all inferences which the evidence fairly supports even though contrary inferences might reasonably be drawn." *Michelman v. Clark-Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1042 (2d Cir.1976) (quoting *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962)). We bear in mind, of course, that the jury's role as finder of fact does not permit it to base its verdict on confusion, speculation or prejudice. *Id.* at 1042. Nevertheless, if there can be more than one reasonable conclusion derived from the evidence, the court cannot substitute its own conclusion for that of the jury's equally tenable conclusion.

Turning to defendants' argument, we note first that other elements aside, the essence of a violation of § 1 of the Sherman Act requires proof of a contract, combination or conspiracy. It is axiomatic in conspiracy cases that there is rarely direct evidence of unlawful agreement, but such an agreement may be proven by "inferences that may fairly be drawn from the behavior of the alleged conspirators." *Schwimmer v. Sony Corp. of America*, 677 F.2d 946, 953 (2d Cir.1982). Such circumstances and inferences must "[a]t a minimum ... suggest a commitment to a common end." *Michelman v. Clark-Schwebel Fiber Glass Corp., supra*, 534 F.2d at 1043.

Defendants' argument that there was insufficient evidence to find conspiracy rests on two related propositions. First, defendants contend that their actions occurring after May 4th, the date on which plaintiff liquidated his position in the market, should not have been admitted at trial and cannot now be relied upon by plaintiff as evidence of conspiracy. Second, defendants contend that excluding post-May 4th evidence, the evidence merely shows one incident of par-

allel conduct, *i.e.*, both held relatively large open short positions, which is insufficient to infer conspiracy.

 We have previously rejected defendants' first proposition, and they have cited no cases in support of the position. This is not surprising, however, since it is well established that evidence of conspiracy, even if occurring before or after plaintiff's damage period, is relevant to proving the existence of the conspiracy as well as the intent, motive and method of the conspirators. *Continental Ore Co. v. Union Carbide & Carbon Corp., supra,* 370 U.S. at 709–10, 82 S.Ct. at 1415–16; *Ambook Enterprises v. Time Inc.,* 464 F.Supp. 1127, 1142 (S.D.N.Y.), *rev'd in part on other grounds,* 612 F.2d 604 (2d Cir.1979), *cert. dismissed,* 448 U.S. 914, 101 S.Ct. 35, 65 L.Ed.2d 1179 (1980). The jury need not examine the conspiracy in a vacuum, *Continental Ore Co., supra,* 370 U.S. at 710, 82 S.Ct. at 1416, and the trial court has wide discretion in admitting evidence which tends to establish conspiracy. *E.g., Mt. Hood Stages, Inc. v. Greyhound Corp.,* 555 F.2d 687, 697 (9th Cir.1977).

 The post-May 4th acts occurred between May 4th and June 1st. This period encompassed both the closing and delivery period on the May contract. Liquidation activity and delivery (or default) which occurred during this period is, in effect, the climax of all previous trading in the contract. Therefore, it is beyond peradventure that defendants' conduct during this period is relevant to the existence of a conspiracy to depress artificially Maine futures prices, and the evidence was admissible for this purpose.

 Having found that actions which occurred after May 4th were admissible to prove conspiracy, defendants' second proposition also fails. We agree that parallel conduct, without more, is insufficient to infer conspiracy. *See Ambook Enterprises, Inc. v. Time, Inc., supra,* 612 F.2d at 612. Yet, this principle is of no help to defendants because there is ample additional evidence here which supports a jury finding of conspiracy. We shall briefly review some of these "plus factors." [2]

First, there was sufficient evidence that defendants shared a common motive to lower the price of May futures. Both defendants were large potato processors in the Northwest, and during the relevant period they had very substantial processing needs for physical potatoes. Both defendants knew that Northwestern potato farmers, from whom defendants bought the bulk of their potatoes, looked to the price of Maine futures when negotiating the price of forward contracts with defendants. Thus, both defendants shared a motive to depress the price of Maine futures and thereby reduce the real cost of potatoes purchased in the cash market or through forward contracts for their processing business.[3]

---

**2.** "Plus factors" are "other facts that serve to transform parallelism into conspiracy (or allow a jury to do so)." P. Areeda, Antitrust Analysis 372–73 (3d ed. 1981). Professor Areeda discusses at least five "plus factors," including evidence of a common motive and traditional circumstantial evidence of agreement, such as conduct by the alleged conspirators which appears very unlikely in the absence of agreement. And in *Delaware Valley Marine Supply Co. v. American Tobacco Co.,* 297 F.2d 199 (3d Cir.1961), the court noted three "'plus' factors such as [1] those emphasized in the simple refusal to deal cases ...; [2] parallelism of a much more elaborate and complex nature; [3] a web of circumstantial evidence pointing very convincingly to the ultimate fact of agreement." *Id.* at 205–06 n. 19.

**3.** There was ample evidence from which the jury could reach this conclusion. For example, defendant Taggares testified:

"Q. Mr. Taggares, in 1976 if the Maine potatoes futures prices went up, would the farmer want to get more money for his potatoes based on that?

A. Yes.

\* \* \* \* \* \*

Q. Now, Mr. Taggares, when you were trading in the futures contracts from March to May 1976, the real dollars involved to you were the effect on your cash market operation, not what you had at risk in the futures market; isn't that correct? Yes or no."

A. Yes." (Tr. 526, 531.)

Gerald Murphy was general manager of the Potato Growers Association of Idaho and represented potato growers in their unsuccessful for-

Obviously, defendants could more effectively ensure the success of their market manipulation, and better spread the risk of loss, by coordinating their market activity. For example, the evidence showed that defendants and their alleged co-conspirators eventually held a combined interest of approximately 98% of the total unliquidated short positions in Maine futures. Without concerted effort, it is doubtful that any individual trader would have successfully amassed such a dominant percentage interest or exerted such downward pressure on market price.

In addition to presenting credible evidence of motive as indirect proof of agreement, *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 287, 88 S.Ct. 1575, 1591, 20 L.Ed.2d 569 (1968); *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939), plaintiff produced substantial circumstantial evidence of agreement. We shall now outline the "web of circumstantial evidence pointing very convincingly to the ultimate fact of agreement." *Delaware Valley Marine Supply Co. v. American Tobacco Co.*, 297 F.2d 199, 205 n. 19 (3d Cir.1961).

The evidence showed that defendants met and had numerous telephone conversations during the conspiracy period; that trading Maine futures was discussed; and that each defendant knew that the other was trading short in the Maine contract. The evidence also showed that defendant Simplot sent $1 million to defendant Taggares to open a futures trading account in the name of their partnership, SimTag Farms. After opening the account, SimTag Farms, like its partners, acquired a substantial short position in Maine futures, pooled its liquidation orders through the same broker as defendants, failed to liquidate, and eventually defaulted on its open short contracts.

Defendants cite numerous cases for the proposition that communication or close relations between defendants is insufficient to infer agreement. *E.g.*, *Venture Technology, Inc. v. Natural Fuel Gas Co.*, 685 F.2d 41, 45 (2d Cir.1982); *Oreck Corp. v. Whirlpool Corp.*, 639 F.2d 75 (2d Cir.1980). In these cases, plaintiff failed to offer any credible evidence of agreement in addition to the showing of communication and opportunity to agree. In the instant case, however, plaintiff has presented additional evidence of agreement. Therefore, the jury could properly consider and indeed give "paramount importance" to defendants' frequent communication and admitted discussion of Maine futures. *Bray v. Safeway Stores, Inc.*, 392 F.Supp. 851, 857 (N.D.Cal.1975). *See also Cackling Acres, Inc. v. Olson Farms, Inc.*, 541 F.2d 242, 245 (10th Cir.1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977) (upholding jury verdict where price parallelism accompanied by meetings, telephone calls, internal communication).

Several examples of unusual parallel conduct which occurred shortly after May 4th presented additional circumstantial evidence which the jury could consider in determining the existence of a conspiracy. The evidence showed that the general, if not exclusive, practice among traders in Maine futures contracts is to liquidate their positions, *i.e.*, offset short contracts by buying long contracts, or vice versa, on or before the last day of trading. Nevertheless, both defendants, the interests they controlled, and their alleged co-conspirators failed to liquidate their short positions be-.

ward, or pre-season, contract negotiations with J.R. Simplot in March 1976. Mr. Murphy was familiar with the economics of potato growing, processing and marketing. He testified:

"Q. Did Maine potato futures contract prices play a part in the [forward contract] negotiations?

A. Yes. The position of bargaining associations, including potato growers of Idaho on price objectives, is developed based on indicators such as the Maine potatoes futures contract, the current cash markets for potatoes and any previous settlements of contracts, if there were any, as well as the history of the contract settlements in recent years; and, additionally, cash or cash markets for the finished products." (Tr. 251.)

fore trading ended.[4] This parallel conduct is consistent with a motive to lower futures prices because, as expert testimony revealed, failing to liquidate short contracts with offsetting long contracts withholds normal demand from the market and exerts artificial downward pressure on price.

Yet another example of unusual parallel conduct, consistent with a motive to lower price, is the fact that defendants failed to deliver on, or otherwise satisfy, a substantial number of their open short contracts.[5] Expert testimony established that defaulting on short futures contracts is highly irregular and has the effect of depressing market price.[6]

The evidence also showed that defendants engaged in identical and unusual conduct by placing limit orders rather than market orders to liquidate their open short position on the last day of trading.[7] Moreover, the evidence showed that defendants explicitly agreed to place their liquidation orders, as well as SimTag Farms', with the same floor broker. Expert testimony established that both actions had the effect of artificially reducing demand and lowering the price of Maine futures.

We have now outlined, and by no means exhausted, the evidence of common motive and circumstantial evidence of conspiracy presented at trial. Thus, this case is wholly unlike *Theatre Enterprises, Inc. v. Par-*

---

**4.** At the close of trading in Maine futures on May 7, 1976, Simplot held 727 open, or unliquidated, short contracts; Taggares held 368 open short contracts; and SimTag Farms held 440 open short contracts.

**5.** One thousand of the 1,911 short contracts which were open at the end of trading were never satisfied. At the end of the delivery period on May 25, 1976, Simplot had failed to satisfy 467 contracts, and Taggares had failed to satisfy 326 contracts.

**6.** For example, plaintiff's expert, Professor Gray, testified:

"Q. Other than what you've already testified to, did you observe any other acts in this record that were the type of act that could result in a price not reflective of supply and demand as you testified?

A. Yes. I did.

Q. What is that?

A. Continuing beyond the failure to liquidate, because the liquidations could only occur on May the 7th. That's the last day under the rule that these can be traded.

Now, if you haven't liquidated, you're obliged to make delivery during the subsequent delivery period.

\* \* \* \* \* \*

During the subsequent delivery period, when having failed to liquidate, these positions were required to obtain potatoes and delivered again under the rules, the potatoes were not obtained and deliveries were not made. So ultimately there was default on the contract. And the default applied, as I recall, to roughly half of these short positions.

Q. It's a matter of record that there were 1,000 defaulted contracts on 1911 open positions at the end of trading.

How would the failure to deliver have any effect on prices?

A. Again, in order to make delivery one is going to have to go and buy potatoes, potatoes which have to meet the quality specifications on the contract, and have to be shipped into the market. So that's a demand for potatoes which demand was kept from the market because the potatoes weren't purchased.

\* \* \* \* \* \*

Q. All right. Now, I understand that failure to deliver withholds a demand or buying pressure in the market. Is that what you just testified to, Professor Gray?

A. Yes.

Q. Over time, if you look at the context of the short position over time, then a failure to liquidate, then a failure to deliver, in economic terms, can you give a description of what that represents to the marketplace?

\* \* \* \* \* \*

A. What that represents to the marketplace over the period of time is, as this position is built up and not being liquidated and as it gets larger, then there is increasing downward pressure on prices." (Tr. 896–98.)

**7.** A market order refers to a direction to the brokerage company, or its floor trader, to purchase a given number of futures contracts at the current market price. For example, to close out, or liquidate, a short position of fifty contracts on the last day of trading an order for fifty long contracts "at market" might be placed. The broker would then purchase fifty long contracts at the going market price. A limit order, on the other hand, specifies a level which the market price must reach before offsetting futures contracts are purchased.

The evidence showed that on the last day of trading, defendants placed limit orders for offsetting long contracts at a price specification substantially below the market price. Consequently, defendants did not obtain sufficient long contracts.

*amount Film Distributing Corp.*, 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954), on which defendants principally rely. In that case, the Court affirmed the denial of a directed verdict for plaintiff because defendants had offered evidence of independent business reasons sufficient to contradict the inference of conspiracy from their parallel conduct. The record revealed no additional evidence of conspiracy.[8]

Similarly, *Modern Home Institute, Inc. v. Hartford Accident & Indemnity Co.*, 513 F.2d 102, 111 (2d Cir.1975), is inapposite. In that case, the court affirmed the district court's grant of summary judgment for defendant because plaintiff simply failed to contradict defendant's "overwhelming" and "undisputed" evidence that each defendant acted unilaterally and independently. *Id.* at 111–12. In this case, however, defendants' evidence was neither overwhelming nor uncontradicted.

Defendants did offer explanations for their conduct. For example, they presented evidence to show that they were short in Maine futures because they were hedging their inventory of physical and processed potatoes. But plaintiff contradicted this evidence with evidence that defendants were actually in need of potatoes for their processing businesses and therefore should have been on the long, or buy, side of the market. Plaintiff's expert also offered testimony which cast considerable doubt on defendants' notion that they could hedge their processed potato inventory by trading in the Maine futures market.

Defendants also attempted to show independent business reasons for their parallel failure to liquidate, their use of limit orders, their agreement to place liquidation orders through one broker, and their defaults. Yet, their evidence merely supported contrasting interpretations and, at best, presented contradictory evidence which the jury was entitled to believe or

disbelieve, just as it was free to believe or reject plaintiff's evidence and inferences. The jury chose to believe plaintiff's credible version over defendants', and it is not our prerogative in such a case to usurp the jury function by second guessing.

Thus, having reviewed all the evidence, including but not limited to that which is outlined above, we cannot say that

(1) there is such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him.

*Mallis v. Bankers Trust Co.*, 717 F.2d 683, 688 (2d Cir.1983). Therefore, we deny defendants' motion for judgment notwithstanding the verdict on the issue of conspiracy.

### B. *Conspiracy: New Trial*

■ Defendants move for a new trial, in the alternative to their motion for judgment n.o.v., on the issue of conspiracy. Bearing in mind that the standard of review in a motion for a new trial is somewhat less stringent than that for judgment n.o.v., *Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d Cir.1978), we nevertheless deny the motion.

■ Defendants offer no additional arguments in support of a new trial, and we certainly cannot say on the record before us that the jury's finding of conspiracy, based on all the evidence, is a "seriously erroneous result or represents a miscarriage of justice." *Mallis v. Bankers Trust Co., supra*, 717 F.2d at 691. Thus, we deny defendants' motion for a new trial as it pertains to the jury's finding that defendants conspired to restrain trade in violation of § 1 of the Sherman Act.

---

**8.** Plaintiff had offered additional evidence of conspiracy in the form of decrees entered into by defendant Paramount in the government's prior equity suit against Paramount. These decrees, however, did not suffice as additional evidence of conspiracy in the *Theatre Enterpris-*

*es* suit. The Court stated: "Alone or in conjunction with the other proof of petitioners, they would form no basis for a directed verdict." *Theatre Enterprises, supra*, 346 U.S. at 541, 74 S.Ct. at 260. Therefore, plaintiffs had to rely solely on their evidence of parallelism.

## II.

### Legal Sufficiency of the Evidence of Artificial Price

Plaintiff argues that defendants cannot challenge the legal sufficiency of the evidence of artificial price on their motion for judgment n.o.v. because they failed to assert it as a ground for their motion for a directed verdict at trial. We agree. Rule 50(a), Fed.R.Civ.P., requires that a motion for a directed verdict state the specific grounds for the motion. Since the motion for judgment n.o.v. is actually a renewal of the motion for a directed verdict, it is clear that the moving party is bound by the grounds raised on the directed verdict motion. *U.S. Industries, Inc. v. Blake Construction Co.*, 671 F.2d 539, 548 (D.C.Cir.1982); *Sulmeyer v. Coca Cola Co.*, 515 F.2d 835, 846 (5th Cir.1975). *See also* 5A Moore's Federal Practice ¶ 50.08.

We have examined the transcript in detail to determine whether defendants raised the issue of the insufficiency of the artificial price evidence in their motion for a directed verdict. At the close of plaintiff's case, defendants' counsel clearly stated that the grounds for his motion were the insufficiency of the evidence of a conspiracy between Simplot and Taggares and an argument that the antitrust claim should be dismissed in light of the remedy afforded by the Commodity Exchange Act (Tr. 1020–27). At the close of defendants' evidence, counsel reiterated the motion (Tr. 1129), but at no time did he raise the issue which defendants would now have us consider. Defendants' reference to a footnote in their November 14, 1983 memorandum in support of their motion for a directed verdict is unavailing, especially since it appears as part of their argument that the evidence of conspiracy is insufficient. We therefore conclude that defendants are precluded on the judgment n.o.v. motion from relying on a ground not raised on the directed verdict motion.

In any event, there was sufficient evidence of artificial price to withstand either the motion for judgment n.o.v. or the motion for a new trial. As we outline in detail below in our discussion of the alleged excessiveness of the verdict, evidence of low supply of Maine potatoes in 1976 and high export demand for them in Europe provided a basis for the jury's finding that the price of the May potato futures contract was artificially low. Additionally, the testimony of plaintiff's expert witness, Professor Gray, was evidence from which the jury could have concluded that the price of Maine futures was artificially low. In fact, Professor Gray testified specifically that, in his opinion, the prices of Maine futures in 1976 were not reflective of supply and demand (Tr. 903–04). We therefore conclude that defendants' motion based on the legal sufficiency of artificial price evidence must be denied.

## III.

### Excessiveness of the Verdict

We conclude that the $460,000 verdict reached by the jury is not irrational and excessive, and we therefore find no basis for granting either defendants' motion for judgment n.o.v. or their motion for a new trial. The trial court can only grant judgment n.o.v. when there is but one reasonable conclusion which the jury could have reached. *C-Suzanne Beauty Salon, Ltd. v. General Insurance Co.*, 574 F.2d 106, 112 n. 10 (2d Cir.1978). Defendants' argument that there is no basis in the evidence for the jury's damage award is totally without merit, and, although the jury might have reached a different verdict, we think the one it did reach is reasonable. Defendants' motion for judgment n.o.v. must be denied.

On a motion for a new trial based on the excessiveness of the verdict, the trial court should set aside the verdict "only if the amount awarded is so excessive as to compel the conclusion that it is the result of passion or prejudice or is shocking to the 'judicial conscience'." *Dagnello v. Long Island R. Co.*, 193 F.Supp. 552 (S.D.N.Y.1960), *aff'd*, 289 F.2d 797 (2d Cir.1961). *See also Bevevino v. Saydjari, supra.* Once the jury determined that de-

fendants unlawfully manipulated Maine potato futures prices in 1976, it was entitled to make a reasonable damage award in light of the evidence presented. We find that the jury in this case did just that.

A review of the evidence confirms our conclusion that the verdict was in fact reasonable. Plaintiff liquidated his May contracts on April 23 and May 4, at an average price of $9.25. Having found that defendants' manipulation resulted in artificially low prices during the conspiracy period, the jury had to determine what the prices would have been absent the manipulation. In essence, the jury was required to estimate how much higher the prices would have been when plaintiff liquidated his contracts but for defendants' unlawful conduct, and the court so instructed it. The $460,000 figure reached by the jury, therefore, was the equivalent of a finding that the price of the May potato futures contract would have been approximately $18.00, instead of $9.25, had the market been operating solely on the basis of supply and demand. The question before us is whether that finding has resulted in a verdict so high that it represents a miscarriage of justice.

We note first that plaintiff introduced evidence of an unusually low supply of Maine potatoes after the 1975 harvest. In fact, there was evidence that the 1975 crop was the lowest on record (P–1(E)3 and Tr. 65–66). Furthermore, there was evidence that an April 13, 1976 report issued by the United States Department of Agriculture indicated an unusually low supply of Maine potatoes on hand on April 1 (P–1(E)3). The estimate in this report was later revised upward, but that revision was in August, long after it could have had any effect on investors in the May futures contract (Stipulated Facts 8–9). The jury could have concluded from the evidence of low supply that the price of Maine potato futures was artificially low during the conspiracy period.

Similarly, plaintiff introduced evidence of an unusually large European export demand in 1976 (P–1(E)2). This high demand was reflected in the statistics of potatoes exported and in the tremendous price increase for potatoes in Europe (P–3(A)). Testimony at trial corroborated the impact of the export demand on the market (Tr. 68–74) and further justified the jury's finding that the price of Maine potato futures would have been higher absent unlawful manipulation.

The testimony of plaintiff's expert, Professor Gray, is also significant here. Professor Gray concluded that in a properly operating market "the top of the range [of prices for Maine potato futures] could have been $15 or higher." (Tr. 915.) He went on to testify that this estimate was based on "[p]rices two years earlier, with similar circumstances but not with such an extreme export demand and not with such a shortage of Maine potatoes." (Tr. 915.) The jury was not required to accept Professor Gray's testimony, but it certainly was entitled to do so, and its finding that the price would have been about $18.00 is not unreasonable in light of that testimony.

We acknowledge that this was a difficult case for the jury to determine the damage award precisely. In this context, however, it is clear that the jury's verdict should not be set aside as long as it represents a reasonable and fair estimate in light of the available proof. *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264–66, 66 S.Ct. 574, 579–81, 90 L.Ed. 652 (1946); *Lee v. Joseph E. Seagram & Sons, Inc.*, 552 F.2d 447, 455 (2d Cir.1977); *Brink's Inc. v. City of New York*, 546 F.Supp. 403, 410–11 (S.D.N.Y.1982). Since it was their unlawful conduct which not only damaged plaintiff, but also made the calculation of those damages difficult, defendants cannot now complain about the lack of exactitude in the jury's ultimate verdict. *See Sarlie v. E.L. Bruce Co.*, 265 F.Supp. 371, 375–76 (S.D.N.Y.1967).

### IV.

*Conduct of Plaintiff's Counsel*

Defendants' final argument on their motion for a new trial is based on allegedly

improper conduct by plaintiff's counsel during the trial. Defendants assert that a new trial should be granted because plaintiff's counsel expressed his personal opinions to the jury during summation while discussing defendants' failure to liquidate, their default, and their claim that they were engaged in legitimate hedging. They also point to counsel's improper reference to Stephen Sondheimer as a convicted felon. We have reviewed these allegations of improper conduct by counsel in the context of the trial as a whole and conclude that they do not merit a new trial.

 In ruling on a motion for a new trial based on attorney misconduct, the trial court must determine whether counsel's conduct created undue prejudice or passion which played upon the sympathy of the jury. *Dagnello v. Long Island R. Co.,* supra, 289 F.2d at 798. *See* 6A Moore's Federal Practice ¶ 59.08[2]. The trial judge has considerable discretion in determining whether a new trial is required. *Draper v. Airco, Inc.,* 580 F.2d 91, 94–97 (3d Cir. 1978).

We note also that "[i]n arguing to a jury, counsel must properly have some latitude so long as prejudice does not appear." *Schwartz v. Northwest Airlines, Inc.,* 275 F.2d 846 (2d Cir.1960). The comments made by plaintiff's counsel about the default, the failure to liquidate, and hedging were made merely to suggest the kinds of inferences which could legitimately be drawn from the evidence. These comments in the context of the trial as a whole did not constitute the extremely egregious behavior of counsel in *Koufakis v. Carvel,* 425 F.2d 892, 900–05 (2d Cir.1970), or in *Draper v. Airco, Inc., supra.* Counsel's summation was, in our opinion, based on the evidence and did not contain offensive remarks about defendants or defendants' counsel. It does not necessitate a new trial.

With respect to the admittedly improper reference by plaintiff's counsel to Sondheimer, defendants' counsel immediately moved for a mistrial, and the court immediately instructed the jury to disregard the comment. This instruction made it clear that the reference was improper and unwarranted. We think it adequately protected defendants. *See D C Comics, Inc. v. Filmation Associates,* 486 F.Supp. 1273–84 (S.D.N.Y.1980).

Accordingly, defendants' motion for judgment notwithstanding the verdict, or, in the alternative, for a new trial is denied in all respects.

So ordered.