**Donna PARRISH, Plaintiff,**

v.

**Louis SOLLECITO, Individually, James Gallagher, Individually, Mount Kisco Import Cars, Ltd. d/b/a Mount Kisco Honda, and Westchester Import Cars, Ltd, d/b/a/ Acura of Bedford Hills, Defendants.**

**No. 01 Civ. 5420.**

United States District Court, S.D. New York.

Sept. 3, 2003.

Jonathan Lovett, Lovett & Gould, White Plains, NY, for Donna Parrish.

Martin Gringer, P.C., Garden City, NY, for Louis Sollecito, Mt. Kisco Import Car, Mount Kisco Import Cars, Ltd., Westchester Import C. Westchester Import Cars Ltd.

Joshua Adam Marcus, Frankin & Gringer, P.C., Garden City, NY, for James Gallagher, Westchester Import C. Westchester Import Cars, Ltd.

### DECISION AND ORDER

MARRERO, District Judge.

Plaintiff Donna Parrish ("Parrish") brought this action alleging sexual discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the New York State Human Rights Law § 296.[1] Defendants comprise Parrish's former employers and supervisor, whose alleged misconduct gave rise to this action. On April 11, 2003, after a trial in this matter, the jury returned a verdict of liability against defendants Louis Sollecito ("Sollecito"), James Gallagher ("Gallagher") and Acura of Bedford Hills ("Acura") (collectively, "Defendants") on Parrish's retaliation claim, but found for Defendants, as well as for defendant Mount Kisco Honda ("Honda"), on Parrish's hostile work environment sexual harassment claim. The jury awarded Parrish $15,000 in compensatory damages for lost back-pay and $500,000 in punitive damages. Judgment was entered on the jury's verdict on May 20, 2003.

By its Decision and Order, dated April 15, 2003, the Court denied Defendants' motion for judgment as a matter of law,

---

1. The facts underlying this case are set forth by the Court in detail in its previous decision on Defendants' motion for summary judgment. *See Parrish v. Sollecito,* 249 F.Supp.2d 342 (S.D.N.Y.2003). Therefore, the Court will presume familiarity with the relevant factual background in this case.

pursuant to Fed.R.Civ.P. 50(a), with regard to Parrish's retaliation claim and damages. An order was thereafter entered on April 22, 2003 ("April Order"), directing the parties to address the issue of whether the punitive damages awarded by the jury in this case are excessive under the Due Process Clause of the Fourteenth Amendment of the United States Constitution and, in particular, the recent Supreme Court decision in *State Farm Mutual Automobile Ins. Co. v. Campbell,* — U.S. ——, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003).

At the close of Parrish's case-in-chief, Defendants moved for judgment as a matter of law, pursuant to Fed.R.Civ.P. 50(a), on various issues, including punitive damages, arguing that Parrish had not presented sufficient evidence to warrant a jury award of punitive damages. The Court reserved judgment on this issue, as well as on the other issues raised by Defendants for determination as a matter of law, and indicated that it would render its decision after the completion of the jury trial. In support of their motion for judgment as a matter of law pursuant to Fed. R.Civ.P. 50(a), Defendants now submit a memorandum of law with regard to the sufficiency of the evidence presented at trial to satisfy the legal requirements for an award of punitive damages. Also with regard to punitive damages, Defendants move in the alternative for judgment as a matter of law precluding such an award pursuant to Fed.R.Civ.P. 50(b). In the event that their motion for judgment as a matter of law with regard to punitive damages is denied, Defendants request, in the alternative, a new trial and/or remittitur of the punitive damages awarded pursuant to Fed.R.Civ.P. 59. Within this motion, Defendants address the April Order, and in opposition to Defendants' motion, Parrish also addresses the Court's April Order. Parrish applies for an award of attorney's

fees and costs, to which Defendants object, in part, on various grounds.

For the reasons set forth below, Defendants' motion for judgment as a matter of law and for a new trial is DENIED, Defendants' motion for a reduction in punitive damages is GRANTED and Parrish's application for attorney's fees is GRANTED in part.

## I. DISCUSSION

### A. STANDARD FOR JUDGMENT AS A MATTER OF LAW

Rule 50(a) of the Federal Rules of Civil Procedure allows a party to move for judgment as a matter of law at any time before the case has been submitted to the jury. *See Wimmer v. Suffolk County Police Dep't,* 176 F.3d 125, 134 (2d Cir.1999). A motion filed pursuant to Rule 50(a) may be granted if a legally sufficient evidentiary basis to support the non-moving party's claim or defense is absent from the record. *See* Fed.R.Civ.P. 50(a); *Wimmer,* 176 F.3d at 134; *Piesco v. Koch,* 12 F.3d 332, 340 (2d Cir.1993); *Sanders v. The City of New York,* 200 F.Supp.2d 404, 406 (S.D.N.Y. 2002). In assessing the merits of a Rule 50(a) motion, courts must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *See Wimmer,* 176 F.3d at 134; *Piesco,* 12 F.3d at 340; *Sanders,* 200 F.Supp.2d at 406.

Similarly, judgment as a matter of law following a jury verdict, pursuant to Rule 50(b) of the Fed.R.Civ.P., should be entered only when "there is 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or [where there is] such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict

against [the movant].'" *Logan v. Bennington College Corp.*, 72 F.3d 1017, 1021 (2d Cir.1995) (quoting *Concerned Area Residents for Env't v. Southview Farm*, 34 F.3d 114, 117 (2d Cir.1994)). Moreover, in a motion pursuant to Fed.R.Civ.P. 50(b), a trial court "must view the evidence in a light most favorable to the nonmovant and grant that party every reasonable inference that the jury might have drawn in its favor." *Samuels v. Air Transport Local 504*, 992 F.2d 12, 16 (2d Cir.1993). A jury verdict is not to be set aside unless "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable triers of fact could have reached." *Id.* at 14 (quoting *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir.1970)).

## B. *JUDGMENT AS A MATTER OF LAW ON PUNITIVE DAMAGES*

Defendants argue that Parrish has failed, as a matter of law, to satisfy the burden for demonstrating the requisite malice or reckless indifference necessary to support a punitive damages award in this case. Alternately, Defendants argue that they have established a good faith effort to enforce a discrimination policy, thereby legally barring an award of punitive damages. As Defendants first made this argument at the close of Parrish's case-in-chief, they request judgment as a matter of law pursuant to Fed.R.Civ.P. 50(a), or alternately pursuant to Fed. R.Civ.P. 50(b).

■ Punitive damages are available under Title VII in cases in which "the employer has 'engaged in intentional discrimination and has done so with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *Zimmermann v. Assoc. First Cap. Corp.*, 251 F.3d 376, 384 (2d Cir.2001)

(quoting *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 529–530, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999) and 42 U.S.C. § 1981a(b)(3)(D)). In *Kolstad*, the Supreme Court held that the statutory terms "malice" and "reckless" in 42 U.S.C. § 1981a refer to an actor's state of mind. 527 U.S. at 535, 119 S.Ct. 2118. In other words, punitive damages are available to victims of employment discrimination when the employer knowingly violates federal law: "[A]n employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Id.* at 536, 119 S.Ct. 2118.

■ The Supreme Court specifically noted that the cases in which punitive damages are available are only a subset of the cases in which unlawful discrimination can be found, reciting instances in which punitive damages could not be sustained: (1) where an employer is unaware of the federal prohibition; or (2) where an employer discriminates with the belief that its discrimination is lawful, *i.e.*, where the discrimination claim is based on a novel theory of liability or the employer reasonably believes that its alleged discriminatory conduct fell within an exception to liability. *Id.* at 536–537, 119 S.Ct. 2118. Moreover, although egregious or outrageous conduct is evidence of the subjective intent to violate federal law, such conduct is not necessary for a finding of intentional discrimination warranting punitive damages. *Id.* at 538, 119 S.Ct. 2118.

■ Direct evidence that an employer acted with knowledge that the discrimination found by a jury violated federal law is not necessary to prove the requisite state of mind of the employer to justify an award of punitive damages. Rather, the Second Circuit has found that general training in equal opportunity protocol and hiring practices is sufficient to infer aware-

ness of Title VII requirements. *See Zimmermann*, 251 F.3d at 385. Similarly, district courts in this Circuit have held that some familiarity with sexual harassment policies is sufficient to infer knowledge of the federal laws against discrimination. *See Kuper v. Empire Blue Cross & Blue Shield*, No. 99 Civ. 1190, 2003 WL 359462, at *5 (S.D.N.Y. Feb.18, 2003) (testimony concerning knowledge that the ADA prohibited disability discrimination and receipt of ADA training were sufficient to justify jury award of punitive damages); *Lamberson v. Six West Retail Acquisition*, No. 98 Civ. 8053, 2002 WL 59424, at *5 (S.D.N.Y. Jan.16, 2002) (knowledge that it was discrimination to punish an employee for complaining of sexual harassment was sufficient to attribute requisite knowledge of Title VII to employer for purposes of allowing punitive damages); *Equal Employment Opportunity Comm'n v. Yellow Freight Sys.*, No. 98 Civ. 2270(THK), 2002 WL 31011859, at *35 (S.D.N.Y. Sept. 9, 2002) (inferring that a "large and sophisticated national corporation," which indicated in its collective bargaining agreement that it would abide by the ADA, and had made an offer of accommodation upon notice of the discrimination complaint, had the requisite mental state to support an award of punitive damages). Moreover, general knowledge of anti-discrimination law and policy is sufficient to ascribe awareness that particular discriminatory acts are prohibited by federal law. *See Lamberson*, 2002 WL 59424, at *6.

■ The question here is whether a reasonable trier of fact could have inferred from the evidence presented at trial that Acura knowingly violated federal law in retaliating against Parrish. In so determining, the Court must be mindful that all possible inferences are drawn in Parrish's favor. Applying the legal standard in this case, the Court notes that, at trial, Parrish only narrowly satisfied her burden for presenting sufficient evidence to justify a finding of punitive damages, but that, viewed in the light most favorable to her, a jury could reasonably find that punitive damages are warranted in this case.

Specifically, the testimony in the record that there was an attempt, albeit unsuccessful, by Thomas Murray ("Murray"), who acted at the time as the General Manager of Honda, to initiate a sexual harassment policy, as well as Sollecito's testimony that he had dealt with legal counsel on at least one other allegation of sexual harassment, can fairly be understood to establish an awareness by Sollecito, who as the owner of Acura and Honda was ultimately responsible for Parrish's termination, of the prohibitions entailed in Title VII. (*See* transcript of the jury trial in this case conducted from April 7, 2003 through April 11, 2003 ("Tr.") at 174.) Furthermore, Lori Rowe ("Rowe"), an employee of both Honda and Acura, testified that a sexual harassment policy was in place at both those dealerships. Rowe's testimony, much relied upon by Defendants although contradicted by Murray, could also support a jury determination that Sollecito and Gallagher, the General Manager of Acura during Rowe's tenure, were generally aware of sexual harassment prohibitions. (*Id.* at 212.) Accordingly, the evidence presented at trial was sufficient to support a jury determination that Sollecito and/or Gallagher acted with the requisite general knowledge of federal prohibitions against sexual discrimination and retaliation to satisfy the legal standard for awarding punitive damages.

■ Moreover, Title VII imposes employer liability for the malicious or recklessly indifferent discrimination of its agents where an employee serving in a managerial capacity commits the wrong within the scope of his employment, "un-

less the discriminatory actions were in contravention of the employer's good faith efforts to comply with Title VII." *Kuper,* 2003 WL 359462, at *4 (citing *Kolstad,* 527 U.S. at 545, 119 S.Ct. 2118). This defense, which bars the award of punitive damages by a jury even if sufficient evidence of the intent to violate federal law is presented, "requires an employer to establish both that it had an anti-discrimination policy and made [a] good faith effort to enforce it." *Zimmermann,* 251 F.3d at 385.

Defendants argue that because they have produced evidence that a sexual harassment policy was in place at Acura and that it was enforced in good faith, a jury award of punitive damages should be precluded as a matter of law. Defendants argument is flawed in two respects. First, although Lori Rowe testified that a sexual harassment policy existed at Acura and Honda, a jury could reasonably credit the testimony elicited from Murray that, although he attempted to initiate a sexual harassment policy, his efforts were ultimately thwarted by the union-members' demand that any such policy be contained in the union contract' and that ultimately, therefore, there was no sexual harassment policy in place at Honda. (Tr. at 174.) Since Murray's testimony undermines the credibility of Rowe's belief that Honda and Acura maintained a sexual harassment policy, and neither Gallagher nor Sollecito testified that a policy was in place at Honda or Acura, nor produced a copy of such a policy, and because Lori Rowe was only an employee of the dealerships, the evidence would justify a reasonable inference that there was not a sexual harassment policy in place at either dealership.

Second, there is no evidence in the record of Defendants' good faith enforcement of such a policy, even if the jury were to find it was in place at Acura. That Sollecito retained counsel to deal with discrimina-

tion complaints may fairly justify an inference that Sollecito had knowledge of the relevant federal law relating to sexual harassment, but does not definitively establish that any sexual harassment policy in place at Acura was enforced in good faith merely because once a complaint was lodged, defense counsel was retained. Therefore, a jury determination that Acura's sexual harassment policy, if one existed, was not enforced in good faith, is supported by the evidence in the record.

In sum, therefore, the issue of the propriety of punitive damages in this case was properly placed before the jury and was not precluded as a matter of law. Similarly, because there was sufficient evidence in the record to support the jury's verdict that punitive damages were warranted in this case, the jury finding will not be set aside by the Court.

## C. *TITLE VII STATUTORY CAP*

The parties do not dispute that the total award of punitive damages and future compensatory damages in this case, not including lost income and benefits, is subject to a mandatory statutory cap that varies with the size of the employer:

The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party—(A) in the case of a *respondent* who has more than 14 and fewer than 101 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $50,000; (B) in the case of a *respondent* who has more than 100 and fewer than 201 employees in each of 20 or more calendar weeks in the current or preceding calen-

dar year, $100,000; and (C) in the case of a *respondent* who has more than 200 and fewer than 501 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $200,000; and (D) in the case of a *respondent* who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $300,000.

42 U.S.C. § 1981a(b)(3) (emphasis added); *see also Zimmermann,* 251 F.3d at 384. The statutory cap is properly excluded from jury instructions, and only after a verdict is submitted, the trial court must ensure that any award complies with the relevant statutory maximums applicable. *See Luciano v. The Olsten Corp.,* 110 F.3d 210, 221 (2d Cir.1997). However, Parrish requests that an evidentiary hearing be held to determine the identity and size of the employer in this case. Defendants counter that any such inquiry is inappropriate since its purpose would be to determine the number of employees at companies not even party to this action and would be prejudicial to such entities at this late date in the proceedings.

■ Parrish argues that for purposes of applying the statutory cap applicable in this case, the size of the employer should be based on the number of employees in all of Sollecito's nine dealerships, not just in Acura or Honda, which were the entities that actually employed Parrish during the time of the unlawful retaliation found by the jury. To this effect, Parrish argues that because Sollecito owned all nine dealerships, employees often worked for more than one of his dealerships, or were transferred among dealerships, and because payroll for all nine entities was handled by one service, Sollecito's dealerships should be treated as a single entity and the employees of all nine car dealerships counted in determining the size of the employer for

purposes of applying the statutory cap pursuant to 42 U.S.C. § 1981a(b)(3).

The statute, however, applies to the "respondent" in the current action, not a theoretical respondent alluded to in post-trial briefs. *See* 42 U.S.C. § 1981a(b)(3); *see also Greenbaum v. Handlesbanken,* 26 F.Supp.2d 649, 652 (S.D.N.Y.1998) ("The cap is based on how many employees the "respondent" has; assuming this word has the same meaning throughout § 1981a, the 'respondent' is the entity against whom the 'action [is] brought by a complaining party' ") (quoting 42 U.S.C. § 1981a(a)). That many of Sollecito's employees were employed by more than one dealership that he owned, or that one billing system was used to pay employees and various dealerships owned by Sollecito, does not alter the identity of Parrish's chosen respondent in this case.

Parrish cites to only one case in this Circuit, *Greenbaum,* that considered the issue of determining an integrated employer for purposes of applying the statutory cap. 26 F.Supp.2d at 651–652. The *Greenbaum* court, paying very close attention to the singular meaning of "respondent" in the statute, made a specific finding that the branch which was a named defendant and its parent were one legal entity based on the well-settled legal principle that a domestic branch of a foreign bank is not a separate entity under New York or federal law. *Id.* at 652–653. Based on this finding of legal equivalence, indicating that naming the branch as a respondent was the same as naming the parent, the court in *Greenbaum* found it appropriate to allow the size of the parent to be the relevant inquiry for imposing the statutory cap.

In this case, however, Acura and/or Honda are separate legal entities from Sollecito's other car dealerships, which is not disputed by Parrish. Simply because Sol-

lecito owns a number of car dealerships and shares certain resources among those dealerships, does not make them a single integrated legal entity comparable to a parent bank and its branch office. Here, Parrish does not even allege that all of Sollecito's entities are one legal entity, nor does the evidence in this case support such a finding.

 Moreover, the single employer theory for imposing liability on affiliates of a primary employer in Title VII cases alluded to by Parrish, although not thoroughly argued under the legal standard for applying the theory to aggregate multiple legal entities, does not necessarily apply to the circumstances presented here. Under the single employer theory, " 'a wronged employee may impose liability on an entity that, although not his employer of record, exercises sufficient control over employment decisions to bear responsibility for the wrong in question.' " *Campbell v. Int'l Brotherhood of Teamsters,* 69 F.Supp.2d 380, 385 (E.D.N.Y.1999) (quoting *Murray v. Miner,* 876 F.Supp. 512, 515 (S.D.N.Y. 1995)). In order for the single employer doctrine to apply, the two entities must share control at the time of the alleged wrong. *See Miner,* 876 F.Supp. at 515.

Here, Parrish is not attempting to impose liability on Sollecito's other dealerships despite the fact that Parrish was not employed by them, but to include the employees of these entities in determining the size of the relevant employer, the "respondent" for the purposes of 42 U.S.C. § 1981a(b)(3). Moreover, Parrish does not allege that Sollecito's other dealerships shared control of the labor decisions made at Acura. The Court is persuaded that the two inquires are distinct because at issue here is only the size of the employer, not the liable entity, which has already been determined by the jury to be Acura. In this regard, the Court notes that the

*Greenbaum* court did not apply the single employer theory for determining the proper entity to examine when applying the statutory cap, nor has any other court in this Circuit. *Id.* at 651–652.

However, a number of courts in other Circuits have determined that the inquiry into the identity of an employer for liability purposes is equivalent to the inquiry for determining the relevant employer when applying the statutory cap on punitive damages. *See Vance v. Union Planters Corp.,* 209 F.3d 438, 447 (5th Cir.2000); *Story v. Vae Nortrak, Inc.,* 214 F.Supp.2d 1209 (N.D.Ala.2001) (indicating that the 'law of the case' as determined by the Eleventh Circuit is that the single entity inquiry is applied in determining the size of the employer).

 To the extent that the single employer theory would apply in determining the size of the employer when imposing the statutory cap in Title VII cases, the doctrine would not rescue Parrish's claim that all of Sollecito's dealerships should be considered and essentially aggregated for this purpose. "To determine whether two entities should be treated as a single employer for Title VII purposes, the Second Circuit considers whether the two entities have: (1) interrelated operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control." *Campbell,* 69 F.Supp.2d at 384 (citing *Cook v. Arrowsmith Shelburne, Inc.,* 69 F.3d 1235, 1240 (2d Cir.1995)); *Brower–Coad v. Fundamental Brokers, Inc.,* 856 F.Supp. 147, 150 (S.D.N.Y.1993). The second factor has been determined to be the most important. *Id.* Generally, such a collapsing of two separate corporate entities should not be found unless the interrelatedness of the companies is pervasive. *See Coraggio v. Time Inc. Magazine Co.,* No. 94 civ. 5429

(MBM), 1995 WL 242047, at *2 (S.D.N.Y. April 26, 1995).

Here, Parrish has not come forward with sufficient allegations or evidence of these factors to warrant treating Sollecito's dealership's as one entity in the employment context. In fact, it is only the fourth factor which Parrish sufficiently alleges, and the second crucial factor is the most deficiently supported. At this stage of the proceedings, the Court will not allow reopening of discovery to delve into this complicated inquiry and potentially give rise to a new round of litigation and motion practice, as this information could have been pleaded in the original complaint and addressed during the normal course of pretrial discovery.

Although the court in *Story* held that the single entity theory applied to both the imposition of liability and determining the size of the statutory cap to be imposed, and that discovery to that effect should be undertaken, the Court is not persuaded that such legal precedent is controlling here. 214 F.Supp.2d at 1210. First, the *Story* court admits that "[a] good argument can be made that [these] two concepts are not the same, because the congressional purposes under the two statutes are not necessarily identical." *Id.* at 1210. However, the district court deemed itself bound by Eleventh Circuit precedent to apply the same legal standard for imposing liability and determining the applicable statutory cap. *Id.* In sofar as this issue has not been resolved by the Second Circuit, such precedent is not controlling in this Circuit and this Court is not bound by it. Moreover, the facts in *Story* reflect a more persuasive case for finding the defendant in that case and its affiliated companies to be a single entity. The defendant in *Story* sold the same products as its affiliates and maintained consolidated financial statements, maintained a common company directory,[2] and the related entities essentially were separated only by geography. *See Id.* at 1211. Here, although all owned or controlled by Sollecito, the dealerships were clearly separate franchises as they sold various lines of cars of different manufacturers.

Moreover, in order to increase the applicable cap, Parrish has presented the relevant employer theory in this case too late in the proceedings—after a trial on the merits has been concluded—to justify amending the complaint, further discovery or a hearing. As Defendants point out, even complaints that include such allegations have been dismissed in comparable circumstances where sufficient specificity is not provided. *See, e.g., Coraggio,* 1995 WL 242047, at *3. Such precedent emphasizes the importance of including such allegations in the complaint and prior to trial to allow proper defense. In *Greenbaum,* for instance, the plaintiff requested that the caption be changed to include the name of the parent company during the trial because of the issue of the statutory cap, and the trial court permitted presentation of evidence as to the size of the parent company during the trial. *Id.* Therefore, additional post-trial discovery, and the resultant prejudice to defendants who are not respondents in the action or allotted an opportunity to present defenses at a trial, was not at issue in *Greenbaum.*

A motion to amend the complaint may be denied, at the discretion of the district court, because of futility of the amendment, undue delay on the part of the movant, had faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previous-

---

2. The *Story* court noted that the common company directory may have been the "single most significant fact tying the companies together." *Id.* at 1211.

ly allowed or undue prejudice to the opposing party by virtue of allowance of the amendment. *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.*, 22 F.3d 458, 462 (2d Cir.1994). It is clear in this case that permitting Parrish to essentially amend the complaint by adding new respondents after a jury trial on the merits has been completed would prejudice Defendants, who did not have a fair opportunity to defend against the claims. *See Town of Orangetown v. Gorsuch*, 718 F.2d 29, 40 n. 10 (2d Cir.1983) (affirming district court's denial of plaintiff's request to amend complaint, two months after completion of trial, where additional defendants would not have had an opportunity to defend against claims at trial); *Campbell v. City of New York*, No. 99 Civ. 5129 LTSTHK, 2003 WL 660847, at *4 (S.D.N.Y. Feb.27, 2003) ("Prejudice is inferred if a party did not have a fair opportunity to defend against the new claims"); *Miwon v. Nissho–Iwai American Corp.*, No. 80 Civ. 4731-CSH, 1984 WL 363, at *1 (S.D.N.Y. May 10, 1984). Parrish can show no cause for the untimeliness of her efforts, as this information and her counsel's awareness of the statutory cap existed years ago when Parrish's complaint was first filed. Such an unjustified delay manifestly would prejudice Defendants in this case and will not be permitted by the Court.

■ Moreover, because the jury has already been dismissed, Fed.R.Civ.P. 49 does not permit Parrish to take further discovery at this time and request that the Court make findings of fact. Rule 49 allows the Court to make factual findings if it inadvertently omits a necessary factual issue in the verdict sheet "raised by the pleadings or by the evidence" and the parties do not object to that omission. Fed. R.Civ.P. 49(a). In this case, Parrish never raised the issue of a single entity theory until her post-trial motion. She cannot bypass normal proceedings concerning unexplored factual issues, which were not even alleged in the complaint, by delay. Accordingly, for the various reasons iterated above, Parrish will not now be permitted to amend her complaint to include Sollecito's other dealerships as defendants or to conduct discovery into whether such dealerships constitute a single employer.

Defendants have submitted a sworn affidavit indicating that Acura and Honda together employed less than 100 persons during the relevant time period, although arguably the relevant employer here is Acura alone since it is the only dealership found liable for retaliation. Consequently, the punitive damage award in this case is capped at $50,000, since no future compensatory or non-pecuniary damages were awarded by the jury. 42 U.S.C. § 1981a(b)(3) ("in the case of a respondent who has more than 14 and fewer than 101 employees in each of 20 or more calendar weeks in the current or proceeding calendar year, $50,000"). The Court disagrees that Gallagher's affidavit is insufficient to determine the number of employees at a dealership at which he is the General Manager. Moreover, it is reasonable that a single car dealership, or even two dealerships, would not have more than 100 employees.

**D. DUE PROCESS PROPRIETY OF PUNITIVE DAMAGES AWARD**

■ Finally, with regard to the propriety of punitive damages, the Court directed the parties to address the question of whether the punitive damages awarded in this case, $500,000, comports with the dictates of the due process clause of the Fourteenth Amendment of the United States Constitution. Both parties have addressed this issue in their submissions.

Although the $50,000 statutory cap determined by the Court to be applicable here mitigates the extent of the due process issue at stake, the Court will address this issue to determine, based on the factors developed by the Supreme Court and outlined in detail below, the proper monetary range for a remedial punitive damages award in this case.

As a starting point for this inquiry, the Court calls attention to another case decided contemporaneously with the action at hand in which the Court addressed at length the multiple issues and complexities entailed in determinations of punitive damage awards in light of the most recent Supreme Court jurisprudence. *See TVT Records v. The Island Def Jam Music Group*, 279 F.Supp.2d 413, 2003 WL 22056308 (2003). Because the analysis there bears significantly on the issues and considerations now before the Court and compel the Court's resolution of this case, a reiteration of the most pertinent portions of that discussion is appropriate here.

The Supreme Court has recognized that "unlimited discretion ... in the fixing of punitive damages may invite extreme results that jar one's constitutional sensibilities." *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 18, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). The *Haslip* court evaluated the sufficiency of the procedures and guidance that governed the trial and appellate review of punitive damages awards, endorsing standards that had been applied by the state courts in the case as sufficiently definite and meaningful to constrain trial courts and juries. Among the criteria assessed for examining the propriety of the amount of punitive damages awarded were:

(a) whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct,

as well as the harm that actually has occurred;

(b) the degree of reprehensibility of the defendant's conduct, the duration of that conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct;

(c) the profitability to the defendant of the wrongful conduct and the desirability of removing that profit and of having the defendant also sustain a loss;

(d) the "financial position" of the defendant;

(e) all the costs of litigation;

(f) the imposition of criminal sanctions on the defendant for its conduct, these to be taken in mitigation; and

(g) the existence of other civil award against the defendant for the same conduct.

*Id.* at 21–23, 111 S.Ct. 1032; *see also TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 460, 462, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) (In upholding, by plurality opinion, a jury's punitive award of $10 million where the verdict for compensatory damages was only $19,000, the Court relied primarily on evidence of the magnitude of potential harm that defendant's conduct would have caused, and of "the amount of money potentially at stake, the bad faith of [defendant], the fact that the scheme employed in this case was part of a larger pattern of fraud, trickery and deceit, and [defendant's] wealth....")

In the first decision by the Supreme Court to overturn a jury award of punitive damages in violation of the federal Due Process Clause, the Court in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), found a civil punitive damages award grossly excessive. There, plaintiff sued

BMW alleging that at the time he purchased his new automobile, BMW failed to disclose that the car actually had been repainted. The jury found BMW liable and returned a verdict assessing $4,000 in compensatory damages and $4 million in punitive damages, upon a determination that BMW's nondisclosure policy constituted "gross, oppressive or malicious fraud." *Id.* at 565, 116 S.Ct. 1589 (citation omitted). BMW defended its nondisclosure practice with evidence that the policy had been in effect since 1983 and complied with applicable statutes in 25 states, on which experience BMW claimed it had long relied.

Though on appeal the Alabama Supreme Court reduced the punitive verdict to $2 million, the Supreme Court found even the remitted award grossly excessive. *See* 517 U.S. at 574, 116 S.Ct. 1589. One of the central considerations in the majority's reasoning was the prerequisite of notice: "Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject her to punishment, but also of the severity of the penalty that a State may impose." *Id.* The *Gore* Court then enunciated and applied three "guideposts" by which lower courts were instructed to measure the adequacy of notice concerning the magnitude of the $2 million punitive sanction the state imposed on BMW for adhering to its nondisclosure policy: (1) the degree of reprehensibility of the nondisclosure; (2) the disparity between the harm or potential harm suffered by plaintiff and his punitive damages award; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases. *See id.* at 574–75, 116 S.Ct. 1589.

As a threshold in its application of these standards to the *Gore* facts, the Court asserted: "Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Id.* at 575, 116 S.Ct. 1589. As part of its consideration of this standard, the Court observed that some wrongs are inherently more blameworthy than others, that the harm BMW had inflicted on plaintiff was purely economic, and that BMW had not evinced indifference or reckless disregard for the health and safety of others. *See id.* at 576, 116 S.Ct. 1589.

With regard to its second guidepost, the *Gore* court observed that the $2 million award upheld by the State, at 500 times larger than the value of the actual harm the jury determined, was "breathtaking," *id.* at 583, 116 S.Ct. 1589, and that there was no evidence that plaintiff or any other subsequent BMW purchaser had experienced any additional harm on account of BMW's nondisclosure policy. *See id.* at 582, 116 S.Ct. 1589. Nonetheless, the Supreme Court, reiterating the stance it articulated in *Haslip,* declined to promulgate any fixed standard to demarcate the boundary where the ratio of punitive damages to compensable harm crosses into impermissible bounds. Rather, the Court reaffirmed its rejection of the categorical notion that the constitutional line is marked by any simple mathematical formula comparing compensatory damages to the punitive award. On this point, it noted that:

[l]ow awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.

*Id.* at 582, 116 S.Ct. 1589.

The Supreme Court's most recent elaboration of the principles governing punitive

damages is articulated in *State Farm*, ——U.S. ——, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), a case decided just days before the jury rendered a verdict in this case. *State Farm* therefore provides timely guidance in determining the appropriate amount of punitive damages here. In *State Farm*, the Court again applied the *Gore* guideposts in finding that a punitive damages award of $145 million, in a wrongful death action where full compensatory damages amounted to $1 million,[3] was constitutionally excessive in violation of the Due Process Clause. *See* —— U.S. at ——, 123 S.Ct. at 1521. The Court's analysis reiterates the criteria promulgated in *Gore* to guide the courts' assessment, noting that while the existence of any one factor may not suffice to sustain an award of punitive damages, "the absence of all of them renders any award suspect." *Id.* at ——, 123 S.Ct. at 1521. Significantly, the Supreme Court further instructed that:

> It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence.

*Id.* (citing *Gore*, 517 U.S. at 575, 116 S.Ct. 1589).

The Court then observed, in applying the *Gore* indices to State Farm's practices, that while State Farm's conduct in handling plaintiff's claims "merits no praise," and justified some penalty, a more modest award would have served the State's legitimate interests in punishing and deterring culpable behavior. Critical to the Supreme Court's considerations in finding error in the state courts' reprehensibility analysis was evidence that the case was used by the state "as a platform to expose, and punish, the perceived deficiencies of State Farm's operations throughout the country,"—practices that may have been lawful in other states where State Farm conducted business—rather than for the specific wrongful conduct that the jury found harmful to the plaintiffs. *Id.* at ——, 123 S.Ct. at 1521–22.

Reviewing the second *Gore* guideline, the Supreme Court again declined to prescribe a fixed ratio between compensatory and exemplary damages beyond which a punitive award would be held excessive. Nonetheless, the *State Farm* court directed how far out the relative size of punitive awards may constitutionally journey before crossing the stygian border line that ushers into the underworld of penal excessiveness, improvidence and error: "Our jurisprudence and the principles it has *now* established demonstrate ... that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* at ——, 123 S.Ct. at 1524 (emphasis added). In this connection, the Court reinforced that: "Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution...." *Id.*

---

**3.** The jury's original award of $2.6 million in compensatory and $145 million in punitive damages was reduced by the trial court to $1 million and $25 million respectively. On appeal, the Utah Supreme Court reinstated the $145 million punitive award, citing State Farm's "massive wealth," and evidence that because State Farm's reprehensible policy in question was clandestine, it would be punished at most in only one out every 50,000 cases, and that State Farm could have faced $10,000 in criminal penalties for every act of fraud, as well as the suspension of its license to conduct business in Utah. *See id.* at ——, 123 S.Ct. at 1519.

Still, the Supreme Court qualified its single-digit caution with a proviso recognizing that higher ratios might yet comport with due process in exceptional cases where " 'a particularly egregious act has resulted in only a small amount of economic damages.' " and where "the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *Id.* (quoting *Gore,* 517 U.S. at 581, 116 S.Ct. 1589).

The Supreme Court's treatment of punitive damages in *State Farm* and *Gore* signal unequivocally that the Due Process Clause serves to constrain jury and court discretion over both the severity of recognized misconduct for which punitive damages may be imposed and the amount of such penalty that may be constitutionally awarded for particular offenses. Less clear in determining the permissible bounds of punitive awards is the assessment of how much is too much. The guideposts the Supreme Court propounded in the recent cases provide a framework for that review.

In synthesis, *Gore* and *State Farm* counsel that the following elements are to be weighed in assessments of the propriety and outer limits of punitive awards: (a) the reprehensibility of the underlying conduct determined by (i) the character of the acts, (ii) the type and extent of the pertinent injuries, actual and potential, and (iii) the nature of the parties and their relationships to each other and to the alleged unlawful conduct giving rise to the action; (b) the proportionality of the punitive award in relation to the relevant harms and the compensatory damages the verdict allocates to redress them; and (c) aggravating or mitigating circumstances or conduct, including those arising during the course of the underlying litigation or other related proceedings.

Applying these factors to the case at hand, the Court is persuaded that a punitive award significantly above the $50,000 cap the Court has found to be applicable here would reach broadly across the divide between an appropriate award and an unconstitutional penalty. On the other hand, the Court deems punitive damages appropriate in this case and finds it unnecessary to reduce the punitive damages award, already reduced to $50,000 by the mandatory statutory cap, any further.

First, the Court examines the most crucial factor, the reprehensibility of the conduct. Although in and of itself the retaliation by Sollecito and Gallagher found by the jury arguably may not rise to the highest levels of egregious or shocking behavior, since the jury in this case did award punitive damages totaling $500,000, the jury clearly found that, at a minimum, the Defendants acted intentionally and "with malice or [ ] reckless indifference to the federally protected rights of an aggrieved individual," a legal requirement for rendering a punitive award in a Title VII case under 42 U.S.C. § 1981a(b)(3)(D). *See Miranda–Ortiz v. Deming,* 94 Civ. 0476 (CSH), 2001 WL 604017 (S.D.N.Y. June 1, 2001) ("The degree of 'reprehensibility' appropriately determined by the jury in this case is fairly reflected by the punitive damages awarded."); *Beckford v. Irvin,* 49 F.Supp.2d 170, 182 (W.D.N.Y. 1999) (the degree of reprehensibility of defendants' conduct was already determined "[b]y [the jury's] finding that defendants were deliberately indifferent to plaintiff's serious medical needs.") The malice or reckless indifference already found by the jury in this case reflects an actionable level of reprehensibility for purposes of determining the appropriateness of an award of punitive damages.

Moreover, regardless of whether the sexual harassment Parrish alleged was

pervasive enough to constitute legally actionable discrimination, based on Parrish's account, as apparently credited by the jury, her complaints to that effect were handled with carelessness and indifference, which the jury found ultimately resulted in unlawful retaliation. Parrish testified that when she first complained to Sollecito about Gallagher's alleged improprieties he "laughed" and said "Just tell him I'll break his fingers if he does that," but then indicated he would talk to Gallagher. (Tr. at 38.) According to her testimony, after the second time Parrish attempted to complain to Sollecito, Sollecito responded that he would talk to Gallagher, but that Sollecito did not really take her complaints seriously. (Tr. at 42.) Most indicative of Sollecito's lack of concern for Parrish's report of Gallagher's egregiously improper touching was Sollecito's response to Parrish's having filed an EEOC complaint: "How could you do this to a married man with a kid?" (Tr. at 46.) Such a comment, coupled with Defendants' retaliatory conduct established by the jury, reflects reckless indifference to Parrish's well-being that is worthy of punishment.

An employer's explicit indifference and subsequent retaliation to charges of unlawful harassment is reprehensible behavior and does affect the health and safety of employees with regard to their general well-being. To argue otherwise is to buck against a complex network of comprehensive and powerful legislation, judicial enforcement and workplace training intended to prevent such abuse. Although in this case the jury clearly found that the retaliation did not create quantifiable emotional distress damages, there is no doubt that careless indifference to discrimination in the workplace resulting in retaliatory conduct by an employer has the potential to cause serious harm to affected employees. In *TXO*, the Supreme Court recognized that in assessing the degree of reprehensi-

bility for punitive damages purposes, the relevant harm is not just the actual loss that the victim suffers but "[t]he magnitude of the *potential harm* ... to [the] intended victim ... as well as the possible harm to other victims that might have resulted if similar future behavior were not deterred." 509 U.S. at 460, 113 S.Ct. 2711 (plurality opinion) (emphasis in original).

Moreover, the reprehensibility of the unlawful conduct found by the jury is aggravated by the nature of the parties in this case, in that Parrish testified to being in a vulnerable economic position after her recent divorce, indicating that she desperately needed her job and that Sollecito was aware of these circumstances. (Tr. at 34.) That Defendants were more financially resourceful than Parrish is not disputed.

The reprehensibility in this case should not, however, be overstated. There was no violence or threat of violence. The actual harm that was found by the jury was economic, not physical—merely lost future income of $15,000. Although Defendants may have affected Parrish's general well-being by their unlawful retaliation, her physical safety was not at risk in this case, nor did the jury find that she was physically or even emotionally affected in a compensable manner. The acts of retaliation actually suffered by Parrish, having her job made more difficult and ultimately being relieved from half her responsibilities, at least in relative terms, were not extreme. In fact, Parrish maintained her job at Honda and most of her compensation. Sollecito testified that he offered to increase her salary and commission at Honda to make up for some of the income Parrish lost by being fired from Acura. (Tr. at 280–281.) Moreover, the evidence in the record does not demonstrate that Parrish was financially vulnerable to the point of being deprived of food, shelter or basic necessities.

The other guidelines for evaluating the constitutionality of a punitive award do not weigh in Parrish's favor. Applying the proportionality factor here evinces clearly that an award of $500,000 vastly exceeds *State Farm's* stated measure of a proper punitive award. A punitive award of $500,000 is over 33 times the compensatory damages of $15,000 the jury awarded, vastly overreaching the single digit multiplier urged by the Supreme Court.

Keeping in mind that the purpose of punitive damages is "to punish the defendant and to deter him and others from similar conduct in the future," the Court finds that the deterrent purposes in this case are readily satisfied by a punitive award of $50,000. *Vasbinder v. Scott*, 976 F.2d 118, 121 (2d Cir.1992). Although the compensatory damages are small in this case, which in some circumstances might justify using a higher multiple to calculate an appropriate punitive damage award, *State Farm*, — U.S. at ——, 123 S.Ct. at 1524, the Court is not persuaded that such a vastly greater award of punitive damages as compared to actual damages is warranted. Rather, given the overall circumstances of this case: the level of reprehensibility; the low degree of actual harm suffered by Parrish from Defendants' improprieties; that the retaliation suffered by Parrish was at most only partial since she kept her job at Honda; and that the Court is also awarding attorney's fees to Parrish, which includes a certain punitive element—weighing all of these considerations, a multiplier of less than four is most appropriate: "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." *Haslip*, 499 U.S. at 23–24, 111 S.Ct. 1032; *State Farm*, — U.S. at ——, 123 S.Ct. at 1524. The Court finds that this guideline—a multiplier of four or less—is appropriately applied here and that the facts presented at the trial of this case do not warrant a punitive award in excess of this baseline.

This conclusion is buttressed by comparing civil penalties imposed in similar cases. For instance, in *Fernandez v. North Shore Orthopedic Surgery & Sports Medicine*, 79 F.Supp.2d 197, 208 (E.D.N.Y.2000), the court reduced the punitive award from $100,000 to $50,000 where no compensatory damages were awarded to the plaintiff and there was no showing that defendant's conduct was violent or involved repeated incidents of misconduct. Similarly, in *Iannone*, the court reduced the punitive damage award from $250,000 to $50,000 where a single incident of retaliation and no sexual harassment was found by the jury. 941 F.Supp. at 413–415; *see also Lamberson v. Six West Retail Acquisition, Inc.*, No. 98 Civ. 8053, 2002 WL 59424, at *7, *8 (S.D.N.Y. Jan.16, 2002) (reducing punitive award of $400,000 to $30,000 on jury finding of retaliation). Accordingly, the Court finds that an award of $500,000 is disproportionately large compared to other similar cases with comparable factual backgrounds, warranting a reduction from $500,000 to the statutory cap of $50,000.

In sum, in addition to the necessary reduction of the punitive award to $50,000 based on the statutory cap applicable here, based on the *Gore* analysis of the due process boundaries of punitive damages awards, reaffirmed and clarified in *State Farm*, the punitive damage award in this case should alternatively be reduced to $50,000 on due process grounds. However, since the statutory cap is the primary and mandatory basis for this reduction, posing the choice to Parrish of accepting a remittitur or holding a new trial on the issue of damages is not necessary.

### E. STANDARD FOR MOTION FOR A NEW TRIAL

Fed.R.Civ.P. 59 governs the determination of whether to grant a new trial. Pur-

suant to Rule 59(a), a new trial may be granted, "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." *See Sharkey v. Lasmo,* 55 F.Supp.2d 279, 283 (S.D.N.Y.1999). Such a decision is "committed to the sound discretion of the trial judge." *Metromedia Co. v. Fugazy,* 983 F.2d 350, 363 (2d Cir. 1992).

The Second Circuit has instructed that "[t]he district court ordinarily should not grant a new trial unless it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Smith v. Lightning Bolt Prods.,* 861 F.2d 363, 370 (2d Cir.1988); *see also Minetos v. City University of New York,* 925 F.Supp. 177, 185–186 (S.D.N.Y. 1996). The trial court is further cautioned that it should only grant a motion for a new trial when the jury's verdict is "egregious." *See DLC Mgt. Corp. v. Town of Hyde Park,* 163 F.3d 124, 134 (2d Cir. 1998). In determining whether granting a new trial is warranted, as opposed to a Rule 50 motion, the district court may independently weigh the evidence in the record without favor to the non-movant. *See Song v. Ives Laboratories, Inc.,* 957 F.2d 1041, 1047 (2d Cir.1992); *Sharkey,* 55 F.Supp.2d at 283.

## F. REQUEST FOR A NEW TRIAL

As an alternative to their request for judgment as a matter of law or a significant reduction in the amount of punitive damages awarded to Parrish, Defendants request a new trial on the ground that the Court improperly included and excluded certain evidence during the trial. The Court denies this request because the evidentiary rulings were not improper, nor would the improprieties alleged by Defendants have created a miscarriage of justice

or so affected the substantial rights of the Defendants so as to warrant a new trial.

Generally, with regard to each of the evidentiary issues raised by Defendants, the Court finds that any error concerning the exclusion or inclusion of evidence during the trial of this case did not affect the result or otherwise deny justice. Rule 61 of the Fed.R.Civ.P. instructs that: "No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice." *See also Phoenix Associates III v. Stone,* 60 F.3d 95, 104–05 (2d cir.1995); *Healey,* 947 F.2d at 620. The Second Circuit has clarified that a substantial right has been affected only where a jury's judgment was likely to have been " 'swayed by the error.' " *Perry,* 115 F.3d at 150 (quoting *Phoenix Associates,* 60 F.3d at 105). The Court is not persuaded that any of the evidentiary issues raised by Defendants meet this standard.

Moreover, the Court notes that the trial court has broad discretion over the admission of evidence. *See, e.g., Healey v. Chelsea Resources Ltd.,* 947 F.2d 611, 619 (2d Cir.1991). Moreover, "[e]videntiary rulings ordinarily will not be overturned absent an abuse of discretion." *Perry v. Ethan Allen,* 115 F.3d 143, 150 (2d Cir.1997) (citing *Healey,* 947 F.2d at 620; *United States v. Torres,* 901 F.2d 205, 234 (2d Cir.1990); *In re Martin–Trigona,* 760 F.2d 1334, 1344 (2d Cir.1985) (evidentiary rulings generally not to be disturbed unless "manifestly erroneous")). The Court finds that its rulings on the eviden-

tiary matters that arose at the trial of this matter were properly within its discretion.

■ First, although the issue was already addressed by the Court in a statement on the record during the trial in response to Defendants' timely objection, Defendants again raise the propriety of the Court's refusal to admit the EEOC determination of Parrish's sexual harassment claim. (Tr. at 89.) The Court reiterates that such an exclusion was properly in its discretion. *See Paolitto v. John Brown E. & C., Inc.*, 151 F.3d 60 (2d Cir.1998). In particular, the Court found that since all the evidentiary matters before the EEOC could be presented to the jury and that therefore the only purpose in presenting the EEOC finding to the jury would be to suggest that the jury should reach the same conclusion, in order to avoid prejudice and confusion with regard to the singular nature of the trial before the Court, the Court excluded the EEOC findings. Exclusion on these grounds is proper. *See id.; see also Denny v. Hutchinson Sales Corp.*, 649 F.2d 816, 821–822 (10th Cir.1981).

Despite the clear holding by the Second Circuit that exclusion of EEOC findings is within the trial court's discretion, Defendants continue to argue that "an EEOC determination should only be excluded upon a showing by the party against whom such a determination is admitted that such determination by the EEOC was weak or untrustworthy." (Memorandum of Law in Support of Defendants' Motion for Judgment as a Matter of Law or Alternatively for a New Trial and/or Remittitur Pursuant to Fed.R.Civ.P. 50 and 59 ("Def. Mem."), dated May 2, 2003, at 14.) However, Defendants misread *Paolitto*. Rather than indicating that the party against whom the EEOC determination is admitted must expose weaknesses to the report, the Second Circuit warns that admitting

the EEOC finding would necessarily lead to forcing that party "to attempt to expose the weaknesses of the report ... an effort that may well confuse or mislead the jury and result in an undue waste of time." *Paolitto*, 151 F.3d at 65; *see also Lovejoy–Wilson v. Noco Motor Fuels, Inc.*, 242 F.Supp.2d 236, 242 (W.D.N.Y.2003) (indicating that an EEOC determination is admissible under the 'public records' exception to the hearsay rule, unless it is deemed to be untrustworthy, but that, "the fact that evidence falls within a hearsay exception does not by itself make it admissible per se. Rather, [t]he district court generally has discretion to exclude such hearsay on other grounds.") Moreover, the *Paolitto* court did not hold, as Defendants urge, that exclusion of an EEOC determination can *only* be made after consideration of the "quality of the report, its potential impact on the jury, and the likelihood that the trial will deteriorate into a protected and unproductive struggle over how the evidence admitted at trial compared to the evidence considered by the agency." (Def. Mem. at 14.) The burden for proving these elements is not on the opposing party, nor must the Court make formal findings on these issues. Rather, the Second Circuit simply noted that since the district court is in the best position to consider these issues, the decision properly lies with the trial judge. *Paolitto*, 151 F.3d at 65. The Second Circuit therefore determined that it is for the trial court to determine whether admission of the EEOC report is proper based on the overall circumstances at trial and the many factors and possible grounds for exclusion or admission discussed in *Paolitto*. Accordingly, the Court properly determined that exclusion of the EEOC finding in this case would serve the interests of justice.

In accordance with the same standards discussed in *Paolitto*, the Court deter-

mined at trial that the EEOC charge and Parrish's affidavit submitted to the EEOC should be excluded because the documents relating to the EEOC investigation and findings would be prejudicial to the case at hand and contain hearsay statements not necessarily made under reliable circumstances. Therefore, the Court does not agree that such an exclusion was an abuse of discretion.

■ Moreover, the Court notes that since Defendants claim that the EEOC charge and Parrish's affidavit to the EEOC would have been used not to prove the truth of the matters contained therein, but to point to Parrish's credibility concerning the alleged sexual harassment, namely that the version of the sexual harassment claim submitted to the EEOC differed substantially from her claims at trial in this case, the jury's finding that no actionable sexual harassment occurred in this case makes any such exclusion, even if improper; harmless and without affect on Defendants substantive rights to a fair trial. *See* Fed.R.Civ.P. 61; *Perry,* 115 F.3d at 151–152 (jury verdict rendered excluded evidence irrelevant and therefore any error by trial court in excluding evidence harmless). Thus, for this reason as well, a new trial is not warranted based on the Court's exclusion of the EEOC charge and Parrish's affidavit submitted to the EEOC.

Next, Defendants argue that a new trial is warranted because of the Court's refusal to allow Gallagher to testify with regard to the nature of the complaints he received from his salespeople concerning Parrish, which was the non-retaliatory reason proffered by Defendants for Parrish's dismissal. During the trial, the Court indicated that Gallagher's testimony concerning such complaints could only be introduced to establish that such complaints were made, but not for the truth of the complaints issued, or such testimony would be in violation of evidentiary rules against hearsay. Therefore, the Court allowed Gallagher to indicate that, generally, complaints concerning Parrish were received by him from the salespeople, but directed Defendants to reserve questions as to the specifics of such complaints for the salespeople themselves whom Defendants indicated would be called to the stand. (*See* Tr. at 303–304.)

In fact, Gallagher did testify that he received continuous complaints concerning Parrish's job performance, and later two of the salespersons who had complained to Gallagher specified the nature of their complaints. (*Id.* at 305–306, 329–331, 344–348.) Therefore, the Court fails to see what relevant information was not introduced to the jury. The Court's ruling in no way prejudiced Defendants' case or affected the substantive rights of the parties.

■ Defendants also argue that the Court erred in permitting testimony concerning Rowe's cessation of employment from Acura and Honda and disciplinary actions against Murray because "such evidence had no relevance to plaintiff's termination and only served to confuse and inflame the jury." The Court notes that its evaluation of relevance is entitled to substantial deference. *See, e.g., George v. Celotex Corp.,* 914 F.2d 26, 28 (2d Cir.1990) ("district court's determination of relevance will not be disturbed unless it evidences an abuse of discretion.") Here, the Court determined that testimony concerning disciplinary actions taken against Rowe and Murray were relevant because evidence in the record supported both Rowe's and Murray's involvement in or witnessing of the alleged sexual harassment and in Parrish's response to the alleged harassment. Therefore, disciplinary action taken against Rowe and Murray was relevant because it could be understood by the jury to buttress Parrish's

claim of retaliation. That Defendants provided legitimate reasons for disciplining Rowe and Murray does not preclude testimony that may show otherwise. The Court cannot agree with Defendants' allegation that the disciplinary actions taken against Murray and Rowe were necessarily wholly unrelated to the alleged retaliation against Parrish; rather, that issue was a matter to be determined by the jury. Such testimony concerning disciplinary action against Rowe and Murray was therefore relevant and proper.

■ Finally, Defendants argue that the Court erred in permitting Parrish's counsel to make inflammatory statements and personal observations during closing statements without instructing the jury to disregard such statements. "A court should 'examine the propriety of a closing argument by reviewing the entire argument within the context of the court's rulings on objections, the jury, and any corrective measures applied by the trial court.'" *Datskow v. Teledyne Continental Motors Aircraft Products,* 826 F.Supp. 677, 686 (W.D.N.Y.1993) (quoting *Nissho–Iwai Co. v. Occidental Crude Sales, Inc.,* 848 F.2d 613, 619 (5th Cir.1988)). Moreover, "the trial court must determine whether counsel's conduct created undue prejudice or passion which played upon the sympathy of the jury" warranting the granting a new trial. *See In re Joint Eastern and Southern Districts Asbestos Litigation,* 124 F.R.D. 538, 544 (S.D.N.Y. 1989) (quoting *Strobl v. New York Mercantile Ex.,* 582 F.Supp. 770, 780 (S.D.N.Y. 1984) and *Draper v. Airco, Inc.,* 580 F.2d 91, 94 (3d Cir.1978)). A new trial is only warranted where the attorney's concluding argument "deprived the opposite party of a fair trial." *Mileski v. Long Island R.R. Co.,* 499 F.2d 1169, 1171 (2d Cir.1974). This determination is within the broad discretion of the trial court. *See, e.g., Strobl,* 582 F.Supp. at 780.

In this case, Defendants objected to a number of statements made by Parrish's counsel during her closing argument and these objections were sustained by the Court. The Court explained to the jury that when an objection is sustained, the jury should not consider the information to which it pertains. Moreover, the Court instructed the jurors at the beginning of the trial, and then again as part of the instructions to them before they began to deliberate, that what the lawyers say in their opening and closing arguments should not be understood as evidence, only argument. It is a well settled rule that the jury is presumed to comply with the Court's instructions. *See, e.g., Datskow v. Teledyne,* 826 F.Supp. at 687. The Court is not persuaded that because these instructions to the jury were not made right after or before the alleged impropriety committed by Parrish's counsel, prior and subsequent charges should not be considered effective in curing any improper statements. To that effect, no further curative instructions were even requested by Defendants. The statements made by Parrish's attorney were not likely to have affected the jury's evaluation of the evidence, particularly in light of the jury instructions given by the Court and the objections which were sustained by the Court. Thus, the Court does not feel that any improprieties that may have been uttered by Parrish's counsel constituted a miscarriage of justice warranting a new trial in this case.

In sum, the Court finds that the trial was fair and that any possible errors were not so pervasive as to be likely to sway a jury's determination, thereby affecting the substantive rights of the parties. Moreover, the Court does not find that any of the evidentiary rulings were improper or

an abuse of discretion. Accordingly, a new trial is not warranted.

### G. ATTORNEY'S FEES

Parrish has applied for attorney's fees and costs pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1988. Parrish's request totals $80,703,50 in attorney's fees and $6,284.41 in costs. Defendants contend that the submitted fee request should be reduced because: (1) the billing rates are excessive in that they exceed the amount set forth in the retainer agreement; (2) Parrish's attained limited success on various of her legal theories and claims; (3) vague billing entries were submitted by counsel; and (4) unnecessary billing was included in the request, specifically time spent by Parrish's opposing Defendants' motion to strike scandalous, impertinent and immaterial material in the original complaint, and stricken by the Court in its decision of May 28, 2002, *see Parrish v. Sollecito,* 01 Civ. 5420(VM), 2002 WL 1072227 (S.D.N.Y. May 28, 2002).

 In federal civil rights actions, "the court, in its discretion may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b). The district court is afforded broad discretion in assessing a reasonable fee award based on the circumstances of the case. *See Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Saulpaugh v. Monroe Comty. Hosp.,* 4 F.3d 134, 145 (2d Cir.1993) ("The calculation of reasonable attorney's fees is a factual issue whose resolution is committed to the discretion of the district court.") The first step in determining a reasonable fee is to calculate the "number of hours reasonably expended on the litigation by a reasonable hourly rate." *Id.* at 433–434, 103 S.Ct. 1933. The Second Circuit has determined that this amount, the lodestar

amount, is strongly presumed to be reasonable. *See Quaratino v. Tiffany & Co.,* 166 F.3d 422 (2d Cir.1999).

#### 1. Reasonable Hourly Rate

 In this case, the hourly rate requested for Jonathan Lovett ("Lovett") and James Bilus Gold ("Gold") is $375.00. According to Parrish, this rate properly reflects Lovett's and Gold's over thirty years of experience in the area of civil rights and employment discrimination litigation. The hourly rate requested by Parrish for the services of Drita Nicaj ("Nicaj"), the associate who performed the majority of the work in this case, is $225.00. Defendants argue that Lovett's and Gold's hourly rates should be reduced because Parrish's retainer agreement specifically states that counsel's hourly rate would be $300.00. (*See* Letter from Lovett & Gould to Parrish, dated June 8, 2001 ("Retainer Agreement"), attached as Exh. A to the Affirmation of Martin Gringer ("Gringer Aff."), dated May 7, 2003.) Parrish counters that the Retainer Agreement specified that the rate could be increased in the future.

 In determining a reasonable hourly rate, courts are instructed to look to market rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Gierlinger v. Gleason,* 160 F.3d 858, 882 (2d Cir.1998); *accord Luciano v. Olsten Corp.,* 109 F.3d 111, 115 (2d Cir. 1997); *Gonzalez v. Bratton,* 147 F.Supp.2d 180, 211 (S.D.N.Y.2001), *aff'd,* 48 Fed. Appx. 363 (2d Cir.2002). The relevant community in this case is the Southern District of New York. *See In re "Agent Orange" Prod. Liability Litig.,* 818 F.2d 226, 232 (2d Cir.1987).

 A reasonable starting point for determining the hourly rate for purposes

of a lodestar calculation is the attorney's customary rate. *See Fink v. City of New York*, 154 F.Supp.2d 403, 406–407 (E.D.N.Y.2001); *Meriwether v. Coughlin*, 727 F.Supp. 823, 831 (S.D.N.Y.1989); *Reid v. New York*, 584 F.Supp. 461 (S.D.N.Y. 1984). In the absence of language in a retainer agreement indicating that the rates referred to were in some way reduced in light of the financial circumstances of the plaintiff, or for whatever reason not the normal market rate the attorney's receive, the retainer agreement is an appropriate reflection of the reasonable, and expected, hourly rate. *See Fink*, 154 F.Supp.2d at 407 (reduced rate in retainer agreement should not be considered the market rate for purposes of determining the lodestar amount); *Save Our Cumberland Mountains v. Hodel*, 857 F.2d 1516, 1524 (D.C.Cir.1988). A retainer agreement, however, is not a binding determinant of the lodestar hourly rate; district courts in this Circuit fix the appropriate hourly rate by reference to "the retainer agreement as well as to an average of the historic fees over the period." *Sands v. Runyon*, 28 F.3d 1323, 1334 (2d Cir.1994) (quoting *Saulpaugh*, 4 F.3d at 146).

The Court finds that although within the outer reaches of market rates, $375.00 is a high fee even for an experienced lawyer in a small firm. *See Gonzalez v. Bratton*, 147 F.Supp.2d at 211–212 (summarizing billing rates in comparable cases). Moreover, the rate now asserted is a considerable increase from the $300 fee cited in the Retainer Agreement. On the other hand, even the Retainer Agreement provided for an increase in rates. Since this litigation extended over a number of years, such an increase in market rates should be accounted for. *See New York State Ass'n for Retarded Children v. Carey*, 711 F.2d 1136, 1153 (2d Cir.1983); *Saulpaugh*, 4 F.3d at 146. Moreover, the Retainer

Agreement provided for a single fee of $300.00 per hour and did not distinguish among different lawyers working on the case, while in requesting fees, Parrish has taken account of prevailing market rates for lawyers of different experience and requested $225.00 per hour for Nicaj's work. Averaging Nicaj's hourly rate and the amount of time she spent on the case with the hourly rate requested for Gould and Lovett, the average hourly rate actually being requested is lower than the $300.00 referenced in the retainer agreement. Given the overall circumstances of the case, including the existence of the Retainer Agreement, the experience of Gould and Lovett, and the prevailing market rates in comparable cases, the Court finds that the appropriate hourly rate for Gould and Lovett for purposes of determining the lodestar amount is $350 per hour.

### 2. *Time Spent Opposing Motion to Strike*

■ Next, Defendants argue that the time Parrish's counsel spent opposing Defendants' motion to strike parts of the complaint held by the Court to be immaterial, impertinent and scandalous should be excluded from an award of attorney's fees. The Court agrees.

In undertaking the lodestar calculation, district courts are instructed to exclude hours that were not "reasonably expended," including, "hours that are excessive, redundant, or otherwise unnecessary …" *Hensley*, 461 U.S. at 434, 103 S.Ct. 1933. Because this Court held that the inclusion of the disputed material in Parrish's complaint was immaterial, impertinent and scandalous, and therefore excluded such material from the record, the inclusion of such material was groundless and not in pursuit of the ultimate result achieved. *See id.; Sands*, 28 F.3d at 1333. There-

fore, time spent on this task is properly excluded from the lodestar amount.

Defendants ask that 6.1 hours spent by Lovett on August 26, 2001 in opposing Parrish's motion be excluded from the lodestar calculation and that Nicaj's time spent in preparation of opposition papers, in the amount of 3.7 hours on May 15 and 16, 2002, be excluded as well. The Court finds that a reduction of $2,959.50, reflecting those time periods and the rates used by Parrish's counsel in determining the total request, is therefore appropriate.

### 3. *Vague Time Entries*

■ Defendants next argue that Nicaj's billing statements contain vague descriptions of the work she performed and that Nicaj is therefore not entitled to full compensation for the hours she billed. The Second Circuit has established the standard for the documentation required in connection with an attorney's fee application: "any attorney ... who applies for court-ordered compensation in this Circuit ... must document the application with contemporaneous time records ... specifying, for each attorney, the date, the hours expended, and the nature of the work done." *New York State Assoc. for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1148 (2d Cir.1983). The time records submitted in support of an application for attorney's fees must be sufficiently detailed to determine the reasonableness of the hours claimed for any given task. *See Sowemimo v. D.A.O.R. Security, Inc.,* 97 Civ. 1083 RLC, 2000 WL 890229, at *4 (S.D.N.Y. June 20, 2000) (attorney billing records must indicate "the date, the hours expended, and the nature of the work done," in order to allow the court to ascertain the reasonableness of the time allotted).

Although Nicaj apparently maintained the requisite contemporaneous time records, the descriptions for a portion of the time billed entail mere characterizations of the type of work done, without specifying the purpose and specific subject matter of the task. Entries such as "Review Parrish file," "Research," and "Drafting, Research" are insufficiently particular. (*See e.g.,* Nicaj's time records, attached as Exh. 1 to the Affidavit of Jane Bilus Gould in Support of Application for Attorney's Fees ("Gould Aff."), for March 13, 2002, August 15, 2002, August 19, 2002, and March 19, 2003.) Specifically, such bare entries do not contain enough information for the Court to ascertain whether a reasonable amount of time was spent on each task described. *See Dailey,* 915 F.Supp. at 1327 (entries listed simply as "telephone call," "consultation," and "review of documents" are not sufficiently specific to enable the court to determine if the hours billed were duplicative or excessive.); *Pressman v. Estate of Steinvorth,* 886 F.Supp. 365, 367 (S.D.N.Y.1995) (plaintiff not entitled to reimbursement for work described in invoices only as "telephone conversation," "prepare correspondence," or "review file").

The Court does note, however, that not all the descriptions in Nicaj's billing entries are so vague as to preclude review and that the nature of the entries vary. In any event, in light of the undetailed records kept by Nicaj, and because of the resulting difficulties the Court would encounter in attempting to parse out reasonable costs and hours for appropriate tasks, the Court finds that a reduction of fifteen percent of the total lodestar amount attributed to Nicaj's billing is warranted.

### 4. *Limited Success*

■ Finally, Defendants assert that the lodestar for Parrish's attorneys in this action should be reduced in half to reflect the limited success achieved by Parrish in

this case. Defendants make this argument on two grounds: (1) the jury specifically found that Parrish was not subjected to a hostile work environment, and (2) the level of success achieved by Parrish on account of her limited recovery of damages and the reduced punitive damages award to which she is entitled.

Although Parrish was not successful in sustaining her hostile environment sexual harassment claim, the Second Circuit has determined that attorney's fees may be awarded for unsuccessful claims, in addition to fees for successful ones, when they are " 'inextricably intertwined' and involve a common core of facts or [are] based on related legal theories.' " *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1183 (2d Cir.1996) (quoting *Dominic v. Consol. Edison Co.*, 822 F.2d 1249, 1259 (2d Cir.1987)); *see also Lunday v. City of Albany*, 42 F.3d 131, 134 (2d Cir.1994) ("So long as the plaintiff's unsuccessful claims are not 'wholly unrelated' to the plaintiff's successful claims, hours spent on the unsuccessful claims need not be excluded from the lodestar amount.") District courts have regularly found that unsuccessful sexual harassment discrimination claims are sufficiently related to retaliation claims to warrant inclusion of time spent on both claims in awarding attorneys fees. *See e.g., Gonzalez*, 147 F.Supp.2d at 212; *Quaratino v. Tiffany & Co.*, 948 F.Supp. 332, 333 (S.D.N.Y.1996) *rev'd on other grounds*, 166 F.3d 422 (2d Cir.1999); *Iannone v. Frederic R. Harris, Inc.*, No. 93 Civ. 4865(JGK)(JCF), 1997 WL 12809, at *2 (S.D.N.Y. Jan.13, 1997); *Reed v. A.W. Lawrence & Co.*, 889 F.Supp. 594, 600 (N.D.N.Y.1995).

■ The Court finds that the facts underlying Parrish's sexual harassment claim were sufficiently related to the facts underlying her retaliation claim to justify an award of fees for her attorneys' work on both these claims. This finding is underscored by the legal requirement that Parrish assert that she was subjected to discriminatory conduct by Defendants—and that her complaints concerning this alleged incident were the trigger for retaliation—in order to recover on her retaliation claim: "A plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful 'so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law.' " *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir.2002) (quoting *Sarno v. Douglas–Elliman Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir.1999)). As such, as part of presenting her successful retaliation claim, Parrish's attorneys necessarily had to address the underlying sexual harassment. Moreover, the facts underlying the sexual harassment discrimination claim asserted by Parrish stem from the same core set of facts as those underlying the retaliation claim; although, logically, the facts that form the basis of the sexual harassment claim precede the facts of the retaliation claim. Thus, the Court finds that Parrish's sexual harassment and retaliation claims are inextricably bound; and therefore, Parrish's attorneys should receive fees for work done in preparation of both of these claims.

■ Similarly, the Court will not reduce the fee award because Parrish was unsuccessful in her attempt to amend the complaint to add a constructive discharge claim. Parrish correctly points out that Defendants initially raised this issue in their summary judgment motion and that Parrish never formally made a motion to amend—her only attempt to include such a claim was in her pre-trial memoranda of law and then at the pre-trial conference before the Court. Even though the Court

refused to allow it to be introduced into the litigation at such a late date, such a claim is based on the same core set of facts as Parrish's retaliation claim and is based on a related theory of law. Attorney's fees attributable to time attempting to add a constructive discharge claim are therefore recoverable in this case.

■ Moreover, although Parrish's attempt to add the constructive discharge claim was ultimately unsuccessful, the proper inquiry is more complicated: "The relevant issue, however, is not whether hindsight vindicates an attorney's time expenditures, but whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir.1992) (citing *Wooldridge v. Marlene Indus. Corp.*, 898 F.2d 1169, 1177 (6th Cir.1990)). Although the constructive discharge claim was ultimately not permitted by the Court, given that it was intricately tied to Parrish's permissible claims, her attorney's pursuit of such a claim was reasonable.

Second, Defendants argue that Parrish's overall level of success warrants a reduction in the fee award. In *Hensley*, 461 U.S. at 434–437, 103 S.Ct. 1933, the Supreme Court explained that a lodestar amount may be reduced even when unsuccessful claims are interrelated with successful claims, if the overall limited results achieved warrant a corresponding reduction in the fee award. This determination is based on the Court's perception of the overall success of the action brought. *See id.* at 435, 103 S.Ct. 1933; *Grant*, 973 F.2d at 101. If a plaintiff has obtained "excellent results," the fee award "should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." *Hensley*, 461 U.S. at 435, 103 S.Ct. 1933. However, "where the plaintiff achieved only limited success, the district

court should award only that amount of fees that is reasonable in relation to the results obtained." *Id.* at 440, 103 S.Ct. 1933. Moreover, the Supreme Court has emphasized that the degree of plaintiff's overall success is "the most critical factor" in determining the reasonableness of a fee award. *Id.* at 436, 103 S.Ct. 1933.

■ The question for the Court, therefore, is whether the recovery achieved in this case falls within the meaning of "limited success." *See Grant*, 973 F.2d at 101. In considering this question, the Supreme Court has instructed district courts to "focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Hensley*, 461 U.S. at 435, 103 S.Ct. 1933.

The punitive award of $500,000 rendered by the jury certainly consists of a successful resolution for Parrish; however, this award was determined by the Court to be capped at $50,000 under Title VII. Parrish's attorneys, experienced in this field of law, are presumed to have been aware of the possibility of a statutory cap in this case, and to have prepared for such a likelihood. Moreover, Parrish did not prevail on her discrimination claim and recovered very limited compensatory damages on her retaliation claim—only $15,000—far less than she sought. Therefore, Parrish's counsel's limited recovery of actual damages does entail limited success, despite the obviously considerable success entailed in the jury's punitive damage award. Accordingly, the Court is persuaded that a reasonable further reduction in the lodestar amount, an additional 10 percent, is warranted.

#### 5. *Amount of Award*

Parrish has submitted an application for an award of attorney's fees totaling $80,703,50 and costs in the amount of

$6,284.81. As no objection has been posed to costs in this case, the costs submitted will be awarded in their entirety. The attorney's fee award should be modified to reflect: (i) an hourly rate of $350 for Gould and Lovett; (ii) a reduction of Lovett's and Gould's billable hours by the time allotted to oppose Defendants' motion to strike; (iii) a reduction in Nicaj's attorney's fee by 15 percent on account of her vague time entries; and (iv) a further reduction of 10 percent of this lodestar amount. By the Court's calculations, the appropriate attorney's fees award in this case is therefore $62,752.16, as detailed in the following chart:

| Attorney | Hours | Rate | Total | Adjustments |
|----------|-------|------|-------|-------------|
| Gould | 58.0 | $350.00 | $20,300.00 | |
| Lovett | 6.3 | $350.00 | $ 2,205.00 | 6.1 hours deducted for time opposing motion to strike |
| Nicaj | 209.9 | $225.00 | $47,219.63 | 3.7 hours deducted for time opposing motion to strike; the balance reduced by 15% for vague billing |
| | TOTAL: | | $69,724.63 | |
| | Less 10% for limited success: | | $ 6,972.46 | |
| | **TOTAL:** | | **$62,752.16** | |

## II. *ORDER*

For the reasons stated above, it is hereby

**ORDERED** that Defendants' motion for judgment as a matter of law pursuant to Rule 50(a) and 50(b) of the Federal Rules of Civil Procedure, with regard to punitive damages, is denied; and it is further

**ORDERED** that Defendants' motion for a new trial pursuant to Fed.R.Civ.P. 59 is denied; and it is further

**ORDERED** that the punitive damages award in this case be reduced to $50,000 in accordance with the statutory cap pursuant to 42 U.S.C. § 1981a(b)(3) and that the judgment in this case be amended to reflect this reduction; and it is finally

**ORDERED** that Defendants pay Parrish's attorney's fees in the amount of $62,752.16 and costs in the amount of $6,284.81.

**SO ORDERED.**